**ROSEPARK PROPERTIES, LTD., Appellee,**

v.

**BUESS, Appellant, et al.**

[Cite as *Rosepark Properties, Ltd. v. Buess,* 167 Ohio App.3d 366, 2006-Ohio-3109.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 05AP–971.

Decided June 20, 2006.

Shuler Law Office, L.L.C., and Gordon P. Shuler, for appellee Rosepark Properties.

James A. Zitesman, for defendant-appellant.

Douglas E. Curtis, for appellee Ohio Commercial Real Estate.

FRENCH, Judge.

{¶ 1} Defendant-appellant, Robert E. Buess, appeals from the September 6, 2005 judgment of the Franklin County Court of Common Pleas in favor of plaintiff-appellee, Rosepark Properties, Ltd. ("Rosepark"), and defendant-appellee, Ohio Commercial Real Estate ("OCRE"). For the following reasons, we reverse.

{¶ 2} This action arose out of a contract for the sale and purchase of real property located at 1870 and 1880 Dunbar Avenue, Columbus, Ohio (the "Property"). The Property, owned by Rosepark, consists of two apartment buildings, containing a total of 41 residential units and a laundry room.

{¶ 3} On or about July 2, 2003, George Sanders, Rosepark's managing member, signed an exclusive-right-to-sell-or-lease listing contract ("Listing Contract"), employing OCRE to list the Property for sale at a price of $650,000. The Listing Contract provided for payment of a commission to OCRE in the amount of either three percent or five percent of the sale price, depending on whether a buyer's broker was involved in the sale. Tony Yacoub holds an Ohio real estate broker's license and owns OCRE.

{¶ 4} On July 30, 2003, Yacoub prepared a real estate purchase contract and addendum on behalf of Buess and Terri Gatewood, who offered to purchase the Property as an income-producing investment for $625,100. The same day, Gatewood signed and delivered to Yacoub a $10,000 deposit check, payable to OCRE and drawn on the account of Buess and Gatewood's corporation, Top Three, Inc.

{¶ 5} On or about August 4, 2003, Buess and Rosepark entered into a real estate purchase contract (the "Purchase Contract"), which consisted of the standard two-page Columbus Board of Realtors real estate purchase contract for industrial, investment, and commercial properties, and an additional page entitled "COUNTER OFFER," signed by Buess and Sanders. The Purchase Contract, which was back-dated to July 2, 2003, provided for a purchase price of $675,000,

but the parties understood that Rosepark would rebate $50,000 at closing, thus reducing the actual purchase price to $625,000. The Purchase Contract stated a closing date of October 1, 2003.

{¶ 6} Relevant to this appeal, the Purchase Contract included the following provisions:

7. DAMAGE OR DESTRUCTION OF PROPERTY: Risk of physical loss to the real estate and improvements shall be borne by Seller until closing, provided that if any property covered by this contract shall be substantially damaged or destroyed before this transaction is closed, Buyer may (a) proceed with the transaction and be entitled to all insurance money, if any, payable to Seller under all policies covering the property, or (b) rescind the contract and thereby release all parties from liability hereunder by giving written notice to Seller and Broker within ten (10) days after Buyer has written notice of such damage or destruction. Failure by Buyer to so notify Seller and Broker shall constitute an election to proceed with the transaction.

8. CONDITION OF IMPROVEMENTS: Seller agrees that upon delivery of deed, the improvements constituting part of the real estate shall be in the same condition as they are on the date of this offer, reasonable wear and tear expected.

\* \* \*

**COUNTER OFFER**

\* \* \*

4. Buyers will deposit ten thousand dollars ($10,000.00) with OHIO Commercial Real Estate which will be applied to the purchase price at the time of closing, but will be non-refundable after 20 days.

{¶ 7} On September 5, 2003, approximately one month before the scheduled closing, a fire occurred inside Unit A–6 of the apartment building located at 1880 Dunbar Drive. Unit A–6 suffered actual fire damage, and Units A–5, A–11, and A–12 suffered smoke damage. Sanders did not receive estimates for the cost of necessary repairs until three weeks after the scheduled closing date. As of December 30, 2003, Sanders's rent roll for the Property listed four units, one-sixth of the units in the building at 1880 Dunbar Drive, as vacant because of fire damage. Sanders testified that Unit A–6:

[N]eeded all new drywall, new appliances, new carpeting, new appliances, all— new kitchen cabinets, countertops, sink, bathroom. All the stuff in the bathroom, tub, sink, shower, all that is done. The electric was fine.

They didn't—except for the receptacles, the receptacles got kind of charred. They didn't rewire. They didn't put a new electric box in.

After the repairs, "everything [in Unit A–6] was brand new except for the electrical."

{¶ 8} On the day of the fire, at Sanders's request, Yacoub informed Buess of the fire by telephone and by letter. Buess testified that in their telephone conversation, Yacoub estimated the fire damage to be approximately $25,000. In his letter, Yacoub wrote:

The Seller has asked me to inform you that the units damaged by the fire are insured and the insurance company has been notified. The proceeds of the policy are available for Seller to make the repairs, or if the buyer prefers (and lender and the insurance company approves), we can proceed to closing and have the repair proceeds assigned to the buyer to make the repairs to the property as they see fit.

Please consider this information and let me know if this option is of any interest to you.

At trial, Sanders testified that he directed Yacoub to send Buess written notice of the fire damage because "it was the right thing to do" but admitted that he previously testified that Buess was entitled to written notice of the fire, pursuant to paragraph seven of the Purchase Contract.

{¶ 9} On September 8, 2003, Buess's attorney, James A. Zitesman, forwarded a letter to Yacoub, rescinding the Purchase Contract and requesting the return of Buess's deposit. Yacoub forwarded the rescission letter to Sanders. Neither Buess nor Zitesman visited the Property to ascertain the extent of the damage before sending the rescission letter.

{¶ 10} A few days after his attorney sent the rescission letter, Buess visited the Property to examine the extent of the damage and "[t]o see if we still—if we had any further interest in the property." While at the Property, Buess had a conversation with Sanders, during which Sanders told Buess that he did not believe that the Property was substantially damaged. Sanders testified that, in the course of their conversation, Buess admitted that the Property was not substantially damaged and agreed to get a letter of intent for a loan and proceed to closing. Sanders "took [Buess] to believe that he changed his mind" regarding rescission. Buess denies revoking his rescission of the Purchase Contract.

{¶ 11} Subsequent to his meeting with Sanders, Buess began negotiating more favorable terms for a purchase of the Property and informed Yacoub that he did not intend to close in accordance with the terms of the Purchase Contract. In a letter dated September 18, 2003, Yacoub forwarded Buess and Sanders a proposed amendment to the Purchase Contract. Between September 21 and 23, 2003, Buess left multiple voice-mail messages for Yacoub, expressing his continued interest in purchasing the Property. In a letter dated September 22, 2003,

Buess and Gatewood requested additional terms to complete their purchase of the Property. Sanders, Yacoub, Buess, and Gatewood met for the last time shortly after September 22, 2003, at which time Sanders refused Buess and Gatewood's proposed terms and insisted that Buess close in accordance with the Purchase Contract.

{¶ 12} On October 17, 2003, Rosepark filed its complaint against Buess and OCRE in the Franklin County Court of Common Pleas, requesting specific performance or damages for breach of contract against Buess and recovery of the $10,000 deposit from OCRE. On October 31, 2003, OCRE filed its answer, a cross-claim against Buess, and a third-party complaint against Gatewood and John Doe. On November 26, 2003, Buess filed an answer to Rosepark's complaint, an answer to OCRE's cross-claim, counterclaims against Rosepark, and cross-claims against OCRE and Yacoub.[1]

{¶ 13} On July 23, 2004, Buess filed a motion for partial summary judgment, requesting judgment on Rosepark's claims for specific performance and breach of contract and on Count One of his counterclaim against Rosepark. On October 15, 2004, the trial court granted Buess's motion for partial summary judgment, finding that the fire caused substantial damage to the Property and, therefore, triggered Buess's right to rescind the Purchase Contract. Nevertheless, the trial court concluded that the $10,000 deposit was nonrefundable, pursuant to the terms of the Purchase Contract.

{¶ 14} On October 25, 2004, Rosepark and Buess filed motions for reconsideration of the trial court's decision granting Buess's motion for partial summary judgment. Buess requested reconsideration only of the trial court's conclusion that he was not entitled to recoup his deposit. On January 20, 2005, the trial court granted Rosepark's motion for reconsideration, determining that genuine issues of material fact as to whether Buess was entitled to rescind the Purchase Contract rendered summary judgment inappropriate. The trial court denied Buess's motion for reconsideration.

{¶ 15} The trial court conducted a two-day bench trial on April 12 and 13, 2005, after which both Rosepark and Buess filed proposed findings of fact and conclusions of law. On August 18, 2005, the trial court issued its 16–page Findings of Fact and Conclusions of Law. The trial court found that the fire did not substantially damage or destroy the Property and that Buess was, therefore, not contractually entitled to rescind. Accordingly, it concluded that Buess

---

1. On April 20, 2004, the trial court dismissed Buess's cross-claim against Yacoub, who was not otherwise a party to the action. On April 20, 2004, and October 15, 2004, the trial court granted OCRE summary judgment on Rosepark's claim against OCRE and on Buess's cross-claims.

breached the Purchase Contract by refusing to close the sale. The trial court also concluded that even if Buess rescinded under paragraph 7(b) of the Purchase Contract, he verbally retracted his rescission when he met with Sanders at the Property. Despite finding that specific performance was an appropriate remedy, the trial court instead awarded Rosepark a judgment against Buess in the amount of $125,000, plus interest and costs. The trial court determined that Rosepark was also entitled to the $10,000 deposit, to be set off against Rosepark's money judgment. Lastly, the trial court determined that OCRE was a third-party beneficiary of the Purchase Contract and awarded OCRE a judgment against Buess in the amount of $18,750, plus interest, on its cross-claim for its commission.

{¶ 16} The trial court filed its final judgment entry on September 6, 2005, and Buess timely appealed, asserting eight assignments of error:

ASSIGNMENT OF ERROR 1: The trial court erred when it found that Mr. Buess breached the Purchase Contract by refusing to purchase the property after the fire, denying his contractual right to rescind the Contract.

ASSIGNMENT OF ERROR 2: The trial court erred when it found that Rosepark was entitled to an award of specific performance.

ASSIGNMENT OF ERROR 3: The trial court erred when it concluded that the fire damage was only a technical breach, and not a material breach under paragraph 8 of the Contract.

ASSIGNMENT OF ERROR 4: The trial court erred when it concluded that even if Mr. Buess properly rescinded in accordance with paragraph 7 of the Purchase Contract, Mr. Buess retracted that rescission orally.

ASSIGNMENT OF ERROR 5: The trial court erred when it determined that Rosepark is entitled to a money judgment against Mr. Buess in the sum of $125,000, plus interest and costs.

ASSIGNMENT OF ERROR 6: The trial court erred when it determined that Rosepark's real estate broker, Ohio Commercial Real Estate (OCRE), was an intended third party beneficiary of the Purchase Contract and therefore entitled to an award of $18,750 plus interest.

ASSIGNMENT OF ERROR 7: The trial court erred when it determined that the $10,000 deposit made by Mr. Buess was non-refundable 20 days after the Purchase Contract was executed.

ASSIGNMENT OF ERROR 8: The trial court erred when it did not find Bad Faith on the part of the Plaintiff in its dealings with the Defendant in ignoring his contractual right to rescind and instead filing a lawsuit.

For ease of discussion, we address Buess's assignments of error slightly out of order.

{¶ 17} Because they both relate to whether the trial court erred in determining that Buess breached the Purchase Contract, we address Buess's first and fourth assignments of error together. In his first assignment of error, Buess contends that the trial court effectively denied his contractual right to rescind the Purchase Contract, while in his fourth assignment of error, Buess contends that the trial court erred by concluding that even if he validly rescinded the Purchase Contract, he orally revoked that rescission.

{¶ 18} A reviewing court will not reverse a civil judgment supported by some competent, credible evidence going to all the essential elements of the case as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. "[I]t is * * * important that [in considering whether the trial court's judgment is against the manifest weight of the evidence] a court of appeals be guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273. However, when addressing matters of contractual interpretation involving questions of law, appellate review is de novo. See *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684.

{¶ 19} Paragraph 7(b) of the Purchase Contract gave Buess the right to rescind "if any property covered by this contract shall be substantially damaged or destroyed before this transaction is closed" by "giving written notice to Seller and Broker within ten (10) days after Buyer has written notice of such damage or destruction." On September 8, 2003, three days after Buess received written notice of the fire damage and the availability of insurance coverage, Buess's attorney forwarded a letter to Yacoub, stating that Buess was rescinding the Purchase Contract. Yacoub forwarded the rescission letter to Sanders. Buess contends that the fire substantially damaged property covered by the Purchase Contract and that within three days of receiving notice of such damage, he gave Yacoub and Rosepark timely written notice of his rescission. Presuming that the fire substantially damaged "any property covered by [the Purchase Contract,]" Buess had a contractual right to rescind the Purchase Contract and validly exercised that right.

{¶ 20} The crux of the parties' dispute is whether "any property covered by [the Purchase Contract]" was substantially damaged or destroyed, thus triggering Buess's right to rescind. The trial court concluded that whether the fire substantially damaged the Property was a question of fact and expressly found that "[t]he Property was not substantially damaged or destroyed by the fire." Buess argues that the trial court premised its factual finding that the fire did not cause substantial damage on a misinterpretation of paragraph 7(b). Specifically, Buess contends that the trial court ignored the word "any" in

paragraph 7(b) and required substantial damage to the *entire* Property to trigger the right to rescind. We thus turn to the language of the Purchase Contract.

{¶ 21} In construing a written contract, the court's paramount objective is to ascertain and give effect to the parties' intention. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920. Generally, courts presume that the parties' intent resides in the language they employ in the contract. *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus. When contract terms are unambiguous, courts will not, in effect, create a new contract by finding an intent not expressed in the clear contractual language. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 246, 7 O.O.3d 403, 374 N.E.2d 146. " 'If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined.' " *Guman Bros. Farm,* 73 Ohio St.3d at 108, 652 N.E.2d 684, quoting *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 474 N.E.2d 271. Unlike questions of fact, appellate courts review questions of law de novo. *Guman Bros. Farm* at 108, 652 N.E.2d 684, citing *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286.

{¶ 22} Under paragraph 7(b), the right to rescind arises if, before closing, "any property covered by this contract [is] substantially damaged or destroyed[.]" Buess argues that inclusion of the word "any" in paragraph 7(b) indicates an intent that the Property, as a whole, need not suffer substantial damage or destruction to trigger the right of rescission. Buess argues that the word "any" means "one of many," and, at trial, Sanders agreed with that definition.

{¶ 23} In its appellate brief, Rosepark argues that in the context of the Purchase Contract, the word "any" means "every" or "all." Rosepark quotes the Merriam–Webster Online Dictionary's definition of "any":

**1:** one or some indiscriminately of whatever kind: **a:** one or another taken at random <ask *any* man you meet> **b:** EVERY—used to indicate one selected without restriction <*any* child would know that>

**2:** one, some, or all indiscriminately of whatever quantity: a: one or more—used to indicate an undetermined number or amount <have you *any* money> **b:** ALL—used to indicate a maximum or whole <needs *any* help he can get> **c:** a or some without reference to quantity or extent <grateful for *any* favor at all>

**3a:** unmeasured or unlimited in amount, number or extent <*any* quantity you desire> **b:** appreciably large or extended <could not endure it *any* length of time>

{¶ 24} We reject Rosepark's interpretation of the term "any." Whereas the word "any" may be used to indicate one selected without restriction ("every"), here, the language of the Purchase Contract expressly restricts "any property" to property covered by the Purchase Contract. Given the Purchase Contract's own restrictive language, we may not interpret "any property" as meaning "every property" as Rosepark proposes. We also reject Rosepark's argument that "any property" refers to "all property" covered by the Purchase Contract. In this context, use of the term "any" to indicate a maximum or whole ("all") eliminates the Purchase Contract's distinction between "any property" in paragraph 7(b), and "the property" elsewhere. Throughout the Purchase Contract, the parties refer to "the property" or "the real estate"; only in paragraph 7(b) do the parties use the term "any property." Based on the parties' use of the word "any" to modify "property" solely in paragraph 7(b), we conclude that "any property" must mean something different than "the property" or "the real estate."

{¶ 25} The trial court found the contractual language unambiguous and concluded that "any property" referred to the apartment complex as a whole, explaining:

> In looking at paragraph 7, you know, we can set out and say if any property, but it talks about any property covered by this contract, and the contract was for the entire piece of property. So that was the property I think that was being discussed with respect to any property. It was the property in question, the apartment complex itself.

> Now, there is no doubt that the property was damaged. It was. The issue is—there's no doubt in the Court's opinion that that one unit, if it was being rented out, and then it can no longer be rented out and it had to be out of service for a substantial period of time, it was substantially damaged. That one unit.

> The issue before the Court is whether the property in question was substantially damaged and whether one unit out of 41 units renders the property— changes the property to such a degree that it's substantially damaged, and the individual has the capability of withdrawing from the contract.

Based on its interpretation that "any property covered by this contract" referred to the entire apartment complex, rather than a part thereof, the court concluded that substantial damage to Unit A–6 did not trigger Buess's right to rescind the Purchase Contract.

{¶ 26} In *Drake v. Burch* (May 27, 1982), Franklin App. No. 82AP–19, 1982 WL 4195, we addressed language in a real estate purchase contract nearly identical to the language contained in paragraph 7(b) of the Purchase Contract. The contractual language in *Drake* provided:

"Risk of loss to the real estate and appurtenances shall be borne by Seller until closing provided that if any property covered by this contract shall be substantially damaged or destroyed before this transaction is closed, the Buyer may (a) proceed with the transaction and be entitled to all insurance money, if any, payable to the Seller under all policies covering the property, or (b) rescind the contract, and thereby release all parties from liability hereunder by giving written notice to the Seller and Broker within ten (10) days after the Buyer has written notice of such damage or destruction."

The *Drake* buyers rescinded after the sellers removed from the property shrubbery and flowers valued at less than $250, which one of the real estate agents offered to reimburse to the buyers.

{¶ 27} The *Drake* trial court stated that "[t]he principle of law * * * is well established and notwithstanding the relatively small and nominal value of the shrubs and plants in comparison to the full purchase price, allows the defendants the right to rescind a contract." On appeal, we noted that the contract listed "all exterior plants and trees" as part of the consideration for the contract. We held that the shrubbery constituted property within the contemplation of the contractual language and that, under the circumstances, the buyer had a right to rescind the contract.

{¶ 28} In *Drake,* the sellers argued that the buyers were not contractually entitled to rescind the contract because there had been no substantial damage to the entire property. We noted the trial court's finding that the removal of the shrubbery did not materially change the character and condition of the property as a whole, stating that that finding could be construed as meaning that the removal did not substantially damage the entirety of the premises. We also noted the trial court's statement that the value of the shrubbery in comparison to the full purchase price was nominal. Nevertheless, we rejected the sellers' argument that only substantial damage to the entire premises gave rise to a right of rescission:

[T]he word "property" is used in a broader sense in the clause and separately refers to each integral part of the real estate. This follows because various features of the real estate, such as landscaping, may have a decided effect both on the desirability and the market value of property. Neither the contract, nor the common law, requires the defendants to accept the property without the shrubbery or to accept the realtor's offer of a payment in money. * * *

Id.

{¶ 29} In addition to disagreeing with the above-quoted reasoning, Rosepark attempts to distinguish *Drake* on its facts. We find Rosepark's attempts to distinguish *Drake* unpersuasive. Rosepark first argues that *Drake* involved the sale of a single-family residence, as opposed to the sale of commercial property at

issue here. Whether or not we agree with Rosepark's proposed distinction between sales of residential and commercial property, the *Drake* opinion does not indicate whether the property at issue was residential or commercial. Rosepark next argues that the *Drake* parties limited our review by not filing a transcript or a statement in lieu thereof. Nevertheless, this court reviewed the admitted facts from the parties' pleadings, the purchase contract, and the trial court's decision, including its findings that the shrubbery was valued at less than $250 and that its removal did not materially change the character and condition of the property. The absence of a more developed record neither affected this court's conclusion nor diminishes *Drake*'s persuasive value. Rosepark also argues that the *Drake* sellers intentionally removed the shrubbery and made no attempt to restore it prior to closing. The intentional nature of the sellers' act, which we discussed in relation to a different assignment of error after concluding that the buyers were entitled to rescind, did not contribute to this court's conclusion that the shrubbery removal gave rise to a right of rescission. Additionally, unlike the scenario in *Drake*, Rosepark could not have restored the Property before the scheduled closing, especially where Rosepark did not even receive estimates for the necessary repairs until three weeks after the scheduled closing.

{¶ 30} As in *Drake*, the plain language of the Purchase Contract provides that the buyer may rescind if "any property covered by [the Purchase Contract]" was substantially damaged or destroyed before closing. Accordingly, consistent with our prior opinion in *Drake*, we hold that substantial damage or destruction need only extend to an integral part of the Property, rather than to the entire Property, to give rise to a contractual right to rescind.

{¶ 31} Like the landscaping in *Drake*, the improvements and fixtures constitute property within the contemplation of the Purchase Contract, and they may have a decided effect on the desirability and market value of the Property. The Purchase Contract contains a paragraph entitled "PROPERTY DESCRIP-TION," which describes the buyer's offer as covering "the following described real estate [identified by address] including, without limitation, all improvements, fixtures, appurtenant rights privileges, and easements." The Purchase Contract also expressly provides that the consideration "shall include all fixtures owned by Seller." Like the shrubbery in *Drake*, the damaged units and the fixtures contained therein constitute an integral part of the Property, substantial damage to which occasions a right of rescission.

{¶ 32} Contrary to Rosepark's argument that a repair estimate prepared by Neverman Construction constituted the only evidence of the amount of damage to the Property, Sanders testified that the final cost of repairs resulting from the fire and smoke damage exceeded $56,000. Sanders testified that, in addition to smoke damage in four other units, the fire required gutting and replacing

everything in Unit A–6 except for the electrical wiring. At trial, Sanders admitted his prior deposition testimony that Unit A–6 was "substantially" damaged. Also at trial, the court itself stated that Unit A–6 was "substantially damaged." Because Unit A–6 suffered substantial damage, and given our conclusion that substantial damage to an integral part of the Property entitled the buyer to rescind the Purchase Contract, we conclude that the record contains no competent, credible evidence supporting the trial court's factual finding of no substantial damage. Thus, the evidence demonstrated that property covered by the Purchase Contract suffered substantial damage in the fire before closing, that Buess, therefore, had a contractual right to rescind, and that he properly exercised that right.

{¶ 33} Before finally determining whether the trial court erred by concluding that Buess breached the Purchase Contract, we must also address Buess's fourth assignment of error. The trial court concluded that, even if Buess properly rescinded the Purchase Contract, he orally retracted his rescission and agreed to complete the sale. In his fourth assignment of error, Buess asserts that the trial court erred by concluding that he orally retracted his rescission, both because the evidence does not support such a finding and because the Statute of Frauds precludes enforcement of an oral contract to purchase real property.

{¶ 34} Initially, we find that competent, credible evidence supports the trial court's finding that Buess orally retracted his rescission. After he became aware of Buess's purported rescission, Sanders encountered Buess at the Property. Sanders testified about the conversation that ensued:

> [W]e had a conversation concerning this letter and when he was going to close and for him to live up to his terms and conditions of the contract. I had met all mine; now when are you going to perform? This wasn't substantial damage or anything like that, and he agreed. He said, "Well, I agree. I'll go and get my letter of intent and get approval so that we can buy this property."

Sanders testified: "I took him to believe that he changed his mind, and he went and got financing." Buess testified that he did not "take back the rescission letter" but agreed that, if he could have come to terms with Sanders, he would have proceeded with the transaction.

{¶ 35} In addition to Sanders's testimony, the record contains additional evidence that Buess proceeded as if he remained in contract. Consistent with Sanders's testimony that Buess agreed to obtain a letter of intent and loan approval, PMC faxed Yacoub a letter of intent, dated September 16, 2003, for a loan to Top Three, Inc., for proposed mortgage financing, to be secured by the Property. Two days later, in a letter to Sanders and Buess, Yacoub wrote:

Having [spoken] with the seller and the buyer and both of you expressed an interest in *clarifying your contract*; please find enclosed an *amendment* to contract dated 7/2/03 * * *.

(Emphasis added.)   Rather than referring to a new contract, Yacoub's letter refers to a proposed clarification of an existing contract and included an attachment entitled "First amendment to contract dated 7/02/03." Yacoub drafted the proposed amendment on Buess's behalf.   In a September 22, 2003 letter to Sanders and Yacoub, Buess proposed additional modifications, stating: "[W]e are still interested in proceeding towards closing provided that the following items are resolved." The trier of fact could reasonably infer from such evidence that, although he was requesting modification of contract terms, Buess was proceeding as if the parties remained in contract.

{¶ 36} "When there is an issue of fact submitted to the trier of fact, * * * and there is credible evidence to support the finding and reasonable minds could come to different conclusions regarding the factual questions, the court of appeals will not interfere with the verdict and resulting judgment." *Farkas v. Bernard* (May 16, 1996), Franklin App. No. 95APE10–1365, 1996 WL 257455, citing *Pokorny v. Local 310* (1973), 35 Ohio App.2d 178, 64 O.O.2d 277, 300 N.E.2d 464, reversed on other grounds (1974), 38 Ohio St.2d 177, 67 O.O.2d 195, 311 N.E.2d 866;  see, also, *Tulloh v. Goodyear Atomic Corp.* (1994), 93 Ohio App.3d 740, 639 N.E.2d 1203.   Conflicting evidence does not render a judgment against the manifest weight of the evidence. *LeCrone v. LeCrone,* Franklin App. No. 04AP–312, 2004-Ohio-6526, 2004 WL 2806387; *Brentlinger Ents. v. Curran* (2001), 141 Ohio App.3d 640, 648, 752 N.E.2d 994.   Upon review, we conclude that competent, credible evidence supports the trial court's conclusion that Buess retracted his rescission.

{¶ 37} Although the record contains competent, credible evidence that Buess verbally agreed to retract his rescission, we must address whether a party may orally revoke a written rescission of a real estate purchase contract to create a contract that is legally binding under the Statute of Frauds.   R.C. 1335.05 provides:

No action shall be brought whereby * * * to charge a person upon * * * a contract or sale of lands, * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized.

Buess contends that his rescission nullified the Purchase Contract and that a new written purchase contract, satisfying the Statute of Frauds, was necessary to enforce a sale of the Property.   To the contrary, Rosepark argues that its complaint charges Buess on the original Purchase Contract and that the Statute

of Frauds requires no additional writing to enforce the terms thereof. Neither Buess nor Rosepark points to any case law addressing the requirement of an additional writing where a party who has rescinded a written contract, subject to the Statute of Frauds, orally revokes or retracts his rescission.

{¶ 38} Concluding that Buess could orally revoke his rescission, the trial court simply stated that oral modifications of written contracts are enforceable in Ohio. In support of its conclusion, the trial court cited four Ohio cases, none of which involved contracts subject to the Statute of Frauds. For example, the trial court cites *Software Clearing House, Inc. v. Intrak, Inc.* (1990), 66 Ohio App.3d 163, 583 N.E.2d 1056, an action for declaratory judgment and accounting for commissions under exclusive sales agreements, in which the First District Court of Appeals stated that "[s]ubsequent acts and agreements may modify the terms of a [written] contract, and, unless otherwise specified, neither consideration nor a writing is necessary." (Footnote omitted.) Id. at 172, 583 N.E.2d 1056. Putting aside the Statute of Frauds issue, the general rule of *Software Clearing House* is inapplicable here because the Purchase Contract requires that "[a]ny amendments to this contract shall be in writing, signed by Buyer(s) and Seller(s)." Thus, the Purchase Contract itself precludes subsequent oral modifications, and the cases on which the trial court relies are irrelevant to the issue before this court.

{¶ 39} Contrary to the trial court's suggestion, the issue here is not whether a subsequent oral modification to the Purchase Contract is enforceable; the issue is whether, after rescission, an oral agreement to comply with the terms of the rescinded contract is enforceable under the Statute of Frauds. In its complaint, Rosepark indisputably seeks to charge Buess with the written Purchase Contract, which was signed by Buess and satisfied the Statute of Frauds. However, Buess validly rescinded the written Purchase Contract in writing, as required by the Purchase Contract. Buess's valid written rescission rendered the Purchase Contract void ab initio. As this court has previously held, "[a] contract which is rescinded is ineffective *ab initio* and no rights may be predicated upon that contract." *May v. State Farm Ins. Co.* (May 14, 1991), Franklin App. No. 90AP–1407, 1991 WL 81925, citing *Schuster Elec. Co. v. Hamilton Cty. Stores, Inc.* (1939), 61 Ohio App. 331, 335, 15 O.O. 222, 22 N.E.2d 582.

{¶ 40} Despite this court's previous holdings that a rescinded contract is void ab initio, Rosepark argues that in the context of the Purchase Contract, rescission refers, generically, to termination of the contract, but does not nullify the contract from its inception. Contrary to Rosepark's argument, however, the Purchase Contract distinguishes between termination and rescission. Paragraph 3(b) offers the buyer the remedy of terminating the contract if, in good faith, he

is unsatisfied with the condition of the Property as described in a property inspection. In contrast, paragraph 7(b) offers the buyer the remedy of rescission, based on substantial damage or destruction to any property under the Purchase Contract prior to closing. Because the Purchase Contract itself distinguishes between termination and rescission, we conclude that the terms have different meanings under the contract. Accordingly, we reject Rosepark's argument that rescission under paragraph 7(b) is nothing more than a termination of the contract, and we conclude that Buess's rescission rendered the Purchase Contract void ab initio.

{¶ 41} An agreement to revive or resurrect a contract for the purchase and sale of the Property is subject to the Statute of Frauds. Although we find no Ohio court that has addressed the need for a separate writing to revive a rescinded or terminated contract within the Statute of Frauds, courts of our sister states have so held. See *James L. Kernan Co. v. Cook* (1932), 162 Md. 137, 159 A. 256 ("[t]o gratify the statute of frauds an agreement to revive the original agreement for the sale of the land must be in writing"); *Patterson v. Davis* (1945), 28 Tenn.App. 571, 580–581, 192 S.W.2d 227 ("where a written contract for the sale of land has ceased and terminated by its own terms upon the happening of a certain contingency, or by the action of the parties under it, an oral agreement to revive it is within the statute [of frauds] and unenforceable"); *Pitek v. McGuire* (1947), 51 N.M. 364, 184 P.2d 647, 653 ("[n]o contract within the statute of frauds that has expired by its terms can be revived and extended by parol"); *Thompson v. Robinson* (1909), 65 W.Va. 506, 64 S.E. 718 (where a written contract for the sale of land has ceased to be operative, an oral agreement reviving the contract does not satisfy the Statute of Frauds). Thus, the Statute of Frauds requires execution of a new writing before Rosepark may charge Buess on a revived contract for the sale of the Property.

{¶ 42} No valid purchase contract remained after Buess informed Yacoub and Sanders, in writing, of his election to rescind the Purchase Contract. Despite Buess's attempts to enter into a new written contract, taking account of the fire damage to the Property, the parties did not reach an agreement or execute a new written purchase contract. Thus, we conclude that an oral revocation of Buess's written rescission of the Purchase Contract did not create or revive a legally binding contract under the Statute of Frauds, and we sustain Buess's fourth assignment of error.

{¶ 43} Having concluded that the trial court erred in determining that there was no substantial damage to "any property covered by [the Purchase Contract]" and in determining that Buess validly retracted his rescission of the Purchase Contract, we find that the trial court's conclusion that Buess breached the

Purchase Contract is against the manifest weight of the evidence. Accordingly, we sustain Buess's first assignment of error.

{¶ 44} In his third assignment of error, Buess asserts that the trial court erred by concluding that the fire damage was a technical breach under paragraph eight of the Purchase Contract. The trial court concluded that Rosepark's inability to deliver the Property in the same condition that it was in at the time the parties executed the Purchase Contract did not constitute a material breach of the Purchase Contract because the fire did not cause substantial damage or destruction. Having found substantial damage and having concluded that Buess did not breach the Purchase Contract, we find Buess's third assignment of error is moot, and we overrule it.

{¶ 45} In his second and fifth assignments of error, Buess contests the trial court's conclusions of law regarding Rosepark's remedies. In his second assignment of error, Buess asserts that the trial court erred by concluding that Rosepark was entitled to specific performance, despite the trial court's ultimate decision not to order specific performance. In his fifth assignment of error, Buess contests the trial court's judgment in the amount of $125,000, plus interest and costs, in favor of Rosepark. Because we have concluded that Buess did not breach the Purchase Contract, we accordingly conclude that Rosepark was not entitled to either an award of specific performance or money damages, and we sustain Rosepark's second and fifth assignments of error.

{¶ 46} We now turn to Buess's sixth assignment of error, in which he argues that the trial court erred when it determined that OCRE was an intended third-party beneficiary of the Purchase Contract and was entitled to an award of $18,750 plus interest, against Buess. In its cross-claim, OCRE alleged that as a result of the Purchase Contract, it was entitled to a commission totaling $18,750 upon closing. OCRE alleged that Buess breached the Purchase Contract, causing harm to OCRE in the form of its lost commission and lost time and expenses in remarketing the Property.

{¶ 47} OCRE's right to a commission arises out of its Listing Contract with Rosepark, which provides:

> Owner hereby agrees to pay the Brokerage a fee of [5% or 3%] of the selling price of said property, if the property is (1) sold or exchanged or (2) an acceptable written offer is submitted to the Owner signed by a ready, willing and able purchaser during the term of this listing.

The Purchase Contract contains no provision for payment of a commission to OCRE. Nevertheless, OCRE argues that it is entitled to a judgment against Buess based on Buess's alleged breach of the Purchase Contract. OCRE does not allege that it was either a party to or an intended third-party beneficiary of

the Purchase Contract. Based on OCRE's failure to allege intended third-party beneficiary status and our conclusion that Buess did not breach the Purchase Contract, OCRE's claim fails. Thus, we conclude that the trial court erred in awarding judgment in favor of OCRE, and we sustain Buess's sixth assignment of error.

{¶ 48} In his seventh assignment of error, Buess asserts that the trial court erred by determining that his $10,000 deposit became nonrefundable 20 days after execution of the Purchase Contract. The trial court concluded that "whether or not [it] determines that Rosepark is entitled to specific performance or to a money judgment against Mr. Buess, Rosepark is entitled to recover the $10,000 deposit." It is unclear whether the trial court meant that Rosepark was entitled to Buess's deposit because he had breached the Purchase Contract or that Rosepark was entitled to the deposit even if Buess had rightfully rescinded. Regardless, based on our determination that Buess rightfully rescinded the Purchase Contract, we conclude that the trial court erred by concluding that Rosepark was entitled to the $10,000 deposit.

{¶ 49} Although the Purchase Contract provides that "[b]uyers will deposit ten thousand dollars ($10,000.00) with [OCRE] which will be applied to the purchase price at the time of closing, but will be non-refundable after 20 days," Buess argues that his rescission renders that provision unenforceable. Specifically, Buess argues that his rescission constituted an annulment of the Purchase Contract, which operates to restore the parties to their original positions, and that Rosepark may not rely on the terms of the Purchase Contract to claim entitlement to Buess's deposit. This court addressed the remedy of rescission in *Mid–America Acceptance Co. v. Lightle* (1989), 63 Ohio App.3d 590, 599, 579 N.E.2d 721, stating:

> [R]escission is not merely a termination of the contract; it is an annulment of the contract. The primary purpose of "rescission" is to restore the parties to their original positions as if the contact had never been formed. Returning the parties to the status quo is an integral part of rescission, and in doing so it is generally necessary to award the party seeking rescission at least his out-of-pocket expenses.

In *May,* we clarified that a rescinded contract "is ineffective *ab initio* and no rights may be predicated upon that contract." See, also, *Perfection Graphics, Inc. v. Sheehan* (June 14, 1996), Geauga App. No. 95–G–1915, 1996 WL 648979; *Dlouhy v. Frymier* (1993), 92 Ohio App.3d 156, 161, 634 N.E.2d 649; *Purvis v. Davish* (June 21, 1976), Butler App. No. CA 75–07–0058, 1976 WL 189453; *Schuster Elec. Co.,* 61 Ohio App. at 335, 15 O.O. 222, 22 N.E.2d 582.

{¶ 50} Rosepark argues that the cases upon which Buess relies are inapplicable because they involve equitable rights of rescission. In such cases, a party is

entitled to elect rescission of a contract based on findings such as fraud, fraudulent inducement, or mistake. In contrast to the equitable remedy of rescission, which unmakes a contract, Rosepark argues that the contractual right of rescission expressed in the Purchase Contract is more akin to simple termination of the contract. Rosepark argues that because the Purchase Contract does not define the term "rescind," it is apparent that it refers to a "termination," not annulment, of the Purchase Contract. While Rosepark correctly notes that the Purchase Contract does not define the term "rescind," Rosepark ignores the fact, as discussed above, that the Purchase Contract distinguishes the remedy of rescission from the remedy of termination. When a buyer rescinds the Purchase Contract, the buyer "thereby release[s] all parties from liability" under the Purchase Contract. The Purchase Contract provides for no such release from liability where the buyer terminates the Purchase Contract, pursuant to paragraph 3(b). Therefore, we reject Rosepark's contention that rescission under paragraph 7(b) accomplishes nothing more than termination of the parties' contractual obligations.

{¶ 51} We also reject Rosepark's argument that because Buess relies on the Purchase Contract for grounds to rescind, the remedy of rescission cannot render the Purchase Contract void ab initio. In the Purchase Contract, the parties agreed and consented to grounds upon which the buyer could rescind the contract. Where a contract is rescinded by agreement, the parties are ordinarily entitled to be restored to the position they would have occupied had no contract existed. See *Brown v. Johnston* (1952), 95 Ohio App. 136, 139–140, 53 O.O. 44, 108 N.E.2d 298. That the Purchase Contract itself provides the grounds for exercising the right of rescission does not affect the equitable nature of the remedy itself. The primary purpose of rescission is to restore the status quo and return the parties to their respective positions had the contract not been formed. *Mid–America Acceptance Co.*, 63 Ohio App.3d 590, 579 N.E.2d 721. To restore the status quo, and because no rights may be predicated upon the Purchase Contract after its rescission, Buess must be entitled to recover his deposit. Accordingly, we conclude that the trial court erred in concluding that Rosepark was entitled to recover the $10,000 deposit, and we sustain Buess's seventh assignment of error.

{¶ 52} In his eighth and final assignment of error, Buess asserts that the trial court erred by failing to find that Rosepark acted in bad faith in its dealings with Buess after the fire and by filing the instant action. Buess's counterclaim included a bad-faith claim, in which Buess alleged that Rosepark failed to abide by the terms of the Purchase Contract. Buess alleged that "[h]ad [he] been aware that [Rosepark] apparently had no intention of abiding by the terms of the contract, he would have never signed it." As a result of the alleged bad faith,

Buess claimed damages in excess of $50,000. In response to Buess's eighth assignment of error, Rosepark argues that Buess abandoned his counterclaims, including his bad-faith claim, at trial. Rosepark also argues that even if Buess had not abandoned his counterclaim for bad faith, the record does not support any such claim. We agree.

{¶ 53} It is apparent from Buess's arguments at trial that he was simply defending Rosepark's claims and not pursuing affirmative relief under his counterclaims. In his opening argument, Buess's counsel did not mention any claim for relief against Rosepark, nor did he argue that Rosepark acted in bad faith. Rather, he simply argued that Rosepark was not entitled to specific performance because Buess validly rescinded the Purchase Contract. Likewise, in his closing argument, Buess's counsel did not address any of his counterclaims or argue in favor of a finding of bad faith. In summary of his argument, Buess's counsel stated:

> Bottom line, Your Honor, we didn't choose this lawsuit. Mr. Buess wanted to exercise his contractual right to rescind. There had been a change in the physical condition of the property. The property was not in the same condition as it was when he contracted. He decided, based on his knowledge, his experience, he didn't want to proceed with this and submitted his letter of rescission.

Upon review, we find that Buess failed to pursue his counterclaim for bad faith at trial and, accordingly, waived any error related to such a claim.

{¶ 54} Despite Buess's failure to pursue his claim for bad faith at trial, Buess's proposed findings of fact and conclusions of law addressed bad faith, not in the context alleged in Buess's counterclaim, but as a means of obtaining attorney fees if Buess prevailed at trial. In the absence of statutory authorization or a finding of conduct that amounts to bad faith, a prevailing party may not recover attorney fees. *Pegan v. Crawmer* (1997), 79 Ohio St.3d 155, 156, 679 N.E.2d 1129. Because the trial court found that Buess breached the Purchase Contract and was, therefore, not the prevailing party, it was unnecessary for the trial court to address Buess's request for attorney fees, and the trial court's failure to do so does not constitute error. Accordingly, we overrule Buess's eighth assignment of error. Nevertheless, because we reverse the trial court's finding that Buess breached the Purchase Contract, the trial court shall hear Buess's claim for attorney fees, based on Rosepark's alleged bad faith, upon remand.

{¶ 55} For the above-stated reasons, we sustain Buess's first, second, fourth, fifth, sixth, and seventh assignments of error, overrule Buess's third assignment of error as moot, and overrule Buess's eighth assignment of error. Accordingly, we reverse the judgment of the Franklin County Court of Common Pleas and

remand this matter to that court with instructions to hear Buess's claim for attorney fees, based on Rosepark's alleged bad faith.

Judgment reversed
and cause remanded.

SADLER and TRAVIS, JJ., concur.