DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Fulton County Court of Common Pleas in a dispute involving the construction of a manufactured home. Because we conclude that the trial court committed no prejudicial error, we affirm.
 {¶ 2} Appellant, Blue Ribbon Homes ("Blue Ribbon"), was the retailer and general contractor for the sale of a manufactured home, built by Commodore Homes, Inc. *Page 2 
("Commodore"), to appellees, Travis and Denise Drenning. Beginning in April 2001, the projected six-week installation of the home became a four year long ordeal involving major construction problems, including a bent main frame on the back half of the home, missing foundation supports, mismatched halves of the home, and numerous other installation issues. Although the Drennings moved into the home in June 2001, problems continued to surface or remained unresolved. Ultimately, in 2005, the Drennings filed suit against Blue Ribbon and Commodore, alleging claims which included, among others, breach of contract, breach of express and implied warranties, negligence, and violation of the Ohio Consumers Sales Protection Act ("OCSPA"). Prior to trial, the Drennings came to a settlement agreement with Commodore, who was then dismissed from the case. Blue Ribbon admitted liability for breach of contract and negligence for some minor repair problems, but denied any liability for structural damage to the frame or for violations of the OCSPA. At a three-day jury trial, held in early December 2005, the following evidence and testimony was presented.
 {¶ 3} Appellees' expert, Joseph Bathalter, testified as to the major structural defects and problems with the home. As a general contractor, Bathalter had constructed 30 to 40 manufactured homes during the preceding five year period. Bathalter agreed that modern manufactured homes could be as good as "stick" homes, if installed and constructed properly. He testified that the home purchased by the Drennings was a metal *Page 3 
frame "HUD" home,[1] subject to strict governmental specifications. He stated that the home consisted of a front and a back half, which came together at a "marriage wall" vertically running down the length of the middle of the home. Bathalter specifically observed that the main frame of the back half of the home had been bent prior to being placed on the concrete foundation. He stated that anyone placing the home on the foundation would have seen this damage. Further, if the home arrived from the manufacturer in that condition, the general contractor should have rejected it, sent it back to Commodore, and requested a replacement. He opined, however, that the frame was bent while it was being moved on the site, not during manufacture, as evidenced by the grass and dirt on parts of the cross member or traverse beams on the underside of the home.
 {¶ 4} Bathalter also noted that the traverse beams, which provided the support for the home, provided less support and stability because they were actually eight inch/10 pound beams and not the eight inch/18 pound beams specified in the plans. He stated that necessary pilasters specified in the plans were missing from the concrete foundation, and that the main I-beam was set too low, causing gaps between it and the main frame. Bathalter stated that because of this defect, the basement was six inches shorter than the nine feet height requested by the Drennings and specified by the plans. The extra height was necessary to permit installation of drop ceilings when finishing off the basement. He *Page 4 
also noted deficiencies in how the beams were attached to the main frame, defects in the electrical wiring, the use of wooden post supports in the basement instead of steel "lolly" posts, and missing basement handrails. He also observed numerous cracks in interior walls of the main floor and an uneven ridgeline on the roof which would permit water to enter the interior of the home.
 {¶ 5} Bathalter provided cost estimates for three potential remedies: 1) $91,100 for rescission and removal of the home, leaving the foundation for another home to be built; 2) $89, 050 for removal and replacement of only the home's rear half with the bent frame; and 3) $36,720 for repair of the home, which would attempt to compensate for the bent frame, but not replace it. He recommended rescission as the most appropriate remedy, since starting over with either a new manufactured home or a "stick" home built to fit on the foundation would give the Drennings what they originally bargained for — a new home free from major defects and repairs. Bathalter noted that, in his opinion, simply repairing the home would not place the Drennings in the position they would have been in had the frame not been bent. He stated that the house would likely have problems in the future and appellees would have to disclose the repairs and damages to potential buyers, making the home less saleable.
 {¶ 6} The subcontractor who poured the concrete foundation testified that he bid and completed the project on the basis of a single sheet of specifications. He stated that he never saw any plans which required the addition of pilasters and that he had never previously utilized them for a manufactured home. He stated that additional concrete *Page 5 
pads had to be added because the plans utilized to construct the foundation were reversed for the home as it was actually constructed. He further stated that he worked at the direction of, and was paid by, the general contractor, Blue Ribbon.
 {¶ 7} Some portion of a deposition of William Pobocik was then read into the record. Pobocik testified as a representative from Commodore, and its position with regard to its liability or the need for repairs.[2]
 {¶ 8} Both Travis and Denise Drennings also testified, stating that they had shopped around before deciding to purchase their home from Blue Ribbon in Wauseon, Ohio. They said they had relied on representations of the salesman, Simon Edwards, who said the house would be constructed quickly, would be better than a "stick" home because of its construction, and would provide "years of worry free living." They suggested the name of the basement subcontractor, but said that Blue Ribbon contacted him, had overseen his work, and had paid him.
 {¶ 9} Denise Drenning testified that on the day that the two halves of the house arrived at the site, she saw part of the transfer from the semi truck to a tractor. She watched and took photographs as the tractor hooked on to the front half of the house and backed it up a steep hill where the foundation had been poured. She left to go to work, but later returned after the back half had been set on the foundation. One of the photos *Page 6 
she had taken showed dirt and grass on the frame of the home, which was still present when they moved into the home. She stated that shortly after moving in, she and her husband realized that the frame was still bent and problems continued to surface. They contacted Blue Ribbon and requested service on the home. The company that attempted repairs on the frame provided the following explanation for the need for service (on a form): "Set crew damaged I-beam and cross members during set of home."
 {¶ 10} Travis Drenning said that during construction he had noticed the bent main frame on the back half of the house, but was told that "it would be okay." He testified that no one from Blue Ribbon told him that there were missing pilaster supports or that the traverse beams had been replaced at a lower grade. He denied requesting that the original steel "lolly" posts in the basement be replaced by wooden timber floor supports. Drenning stated that even after all the attempts to fix the home, the floors felt weak, creaked, and were unlevel and still "spongy. Cracks in the walls continued to reappear even after numerous repairs. When it rained, buckets had to be placed in the basement to catch water which ran through the marriage wall because of the mismatched halves and defective ridge cap on the roof. Blue Ribbon had told them that the cracks were due to the house "just settling," which would subside. The cracks would then be repaired and the house would be fine.
 {¶ 11} The Drennings continued to report problems, but Blue Ribbon eventually stopped responding or coming out to do repairs. Although extremely dissatisfied with the entire structure, the couple tried to live in the home and added a garage, an above ground *Page 7 
pool, and landscaping. Travis Drenning said that he and his wife finally decided to file suit for rescission of the contract because the home continued to be unacceptable and they believed that it would never be the "new" and "worry free" home they purchased under the original contract. The Drennings also expressed concern that any future possible sale of the house would be detrimentally affected since they would be required to disclose the construction history, numerous defects and repairs, and that the house does not conform to HUD regulations.
 {¶ 12} Jerry ("Simon") Edwards, the former president of Blue Ribbon, testified that the company began business in 2000. Until 2002, two Ohio Blue Ribbon sales centers existed, located in Defiance and Wauseon. Before working at the Wauseon Blue Ribbon, however, he had about six years experience in selling and constructing manufactured homes. He stated that the company did not have its own "set crew," but relied on subcontractors to construct the foundation and do the site work. Blue Ribbon hired Ridgeline as the set crew to move the Drennings' home onto the foundation and to install a ridge cap on the roof peak. He stated that, because the Drennings had "picked" the particular subcontractor used to pour the foundation, Blue Ribbon was not responsible for overseeing his work. Edwards insisted that, even though he gave prints to the subcontractor and paid him directly, Blue Ribbon had not "hired" him and was not responsible for him, his work, or the lower ceiling height necessitated by incorrect measurements in the foundation beam pockets. Edwards acknowledged, however, that he was responsible for ordering ten pound instead of 18 pound transverse beams. *Page 8 
 {¶ 13} Edwards also admitted that he knew that the Drennings' home had a bent frame the night after it was set on the foundation and the two halves were joined together. He stated that Ridgeline, the subcontractor Blue Ribbon hired to move the home onto the foundation, never notified him of any damage to the frame. He further said that had he been notified, he would have contacted Commodore and rejected the damaged half. Edwards also acknowledged that the bent frame damage had placed undue stress on the entire structure. He further stated that when parts of the frame were cut out and welded back together with new parts, the rigidity of the home changed, causing structural weakness. Edwards stated that he became seriously ill during the construction of the Drennings' home, and was not at the site "a lot of the time." Finally, he acknowledged that the home, as constructed, was not the new home promised to the Drennings, but stated that any liability for damages rested solely with the factory, Commodore. Appellees rested their case, subject to rebuttal testimony. Appellant moved for a directed verdict which the trial court denied.
 {¶ 14} On defense, appellant presented three witnesses. The first witness, Ray Price, was the service manager at Blue Ribbon at the time of the Drennings' purchase and construction of the home. He stated that the bent frame was not noticed before the house was set because the damage was underneath the basement stairway area. He said that Blue Ribbon contacted Commodore about the bent frame and a factory representative was sent to inspect the damage. According to Price, Commodore then contacted Lippert, the manufacturer of the frame, who sent two men who "fixed the problem." He stated *Page 9 
that Blue Ribbon was never billed for that repair work, but that no one at Commodore ever admitted to him that they were responsible for the frame damage.
 {¶ 15} Price then said that the steel lolly posts were replaced with the wooden posts, allegedly at the Drennings' request, so that they could more easily put up walls when finishing off the basement. Price stated that it was normally company policy that the home purchasers would not be permitted access to the home until it was completed and turned over to them. He said that Travis Drenning had entered through a basement window and used a ladder to inspect the home after Blue Ribbon left the site for the day. Price acknowledged, however, that Drenning did not alter anything or cause any of the damages or defects to the frame, supports, or foundation. He had no personal knowledge of how the frame was bent and had been previously unaware that the Lippert service repair form indicated that the damage to the frame was caused by the set crew.
 {¶ 16} The second witness, William Hesselschwardt, testified that during the time of the Drennings' home construction, he was the vice president and manager of the Defiance Blue Ribbon sales center. In March 2002, when Simon Edwards became ill, Hesselschwardt purchased the business and became the president of Blue Ribbon. The Wauseon center was closed in May 2002. He stated that the only time he met with the Drennings to inspect the home for problems was in August 2002. William Pobocik, a representative from Ridgeline, and the Drennings' lawyer were also present.
 {¶ 17} Hesselschwardt recalled that there were several issues with the main part of the home at the August meeting: incomplete trim around the ceiling cove, sand blowing *Page 10 
through windows, air infiltration through electric receptacles on the inside, and problems with the floor being level at the marriage line. When the basement was inspected, the parties discussed how the house had been set, the improperly low "pockets" for the beams, and the use of blocks and treated wood to shim the gaps between the beams and the main frame. The parties also discussed the ridge cap and water leakage problems. Although the Ridgeline representative said the cap looked fine to him, he offered to replace it. To Hesselschwardt's knowledge, however, this was never done.
 {¶ 18} After the Wauseon center closed, Hesselschwardt took possession of all the branch's business records, including any records related to the Drennings' home. He admitted that prior to his involvement, he had no direct knowledge of any of the communications or actions between Blue Ribbon or its agents and the Drennings.
 {¶ 19} Hesselschwardt also testified that a cross member of the house frame could have been damaged during the set process and that Blue Ribbon would take responsibility for that. He also agreed that Blue Ribbon would make various corrections and repairs, but would not agree to replace the back half of the house due to the frame damage.
 {¶ 20} Appellant's final witness, Richard Kraley, an architect, said that he had inspected the home in November 2004, to assess any damage or problems with the structure. His inspection of the roof showed some detached shingles and a missing end on one ridge vent. He stated that all ridge caps are susceptible to water leakage into a manufactured home, but that the Drennings' ridge cap appeared to be fine and was laying flat as required. *Page 11 
 {¶ 21} Kraley found that the floor inside the home sloped downward, one-sixteenth inch per every foot. He was not sure that it needed to be corrected, explaining that the slope could occur naturally in construction. He stated that when lumber dries, it can either bow or shrink, causing the floor to become unlevel. Kraley opined that water leakage areas from the roof, including the living room wall, outlets, and closets, might be solved by replacing the missing ridge vent. After inspecting the basement, he stated that the house complied with building code requirements, even though certain items did not conform to the original plans or to HUD standards. Kraley suggested that the house could be temporarily jacked up and the beams could be lifted and steel posts installed to raise the basement ceiling height. The old cross beams would be cut out, and new beams would be installed in two sections, instead of the solid, one-piece transverse beams specified in the plans. He stated that lifting the home might cause some slight cracks in the drywall which could be patched and repainted. He also offered suggestions for repair of other problems in the home.
 {¶ 22} Kraley stated that he did not see any evidence of frame damage, other than the area near the stairway which had been repaired by Commodore. He did note that the I-beam that supported the length of the home had an upward bend. In his opinion, the bend could have occurred when the stairway cut was made. He recommended that it be replaced and that a handrail be added to the staircase. According to Kraley, none of the repairs, which should take only a week to complete, would require the Drennings to *Page 12 
vacate the home. Kraley did not see a need to rescind the contract since, under his plan, all the problems could be repaired at a cost of between $10,500 to $18,350.
 {¶ 23} On cross-examination, Kraley acknowledged that he had no experience in constructing or installing manufactured homes. He stated that when he inspected the home, he had not noticed any cracks in the walls, since the owners had not pointed them out to him. He also acknowledged that he was not given and did not consider the specifications or plans for the home when forming his opinions. Kraley further admitted that in a November 2004 report, he had stated that the bent beam "must" be replaced, but at trial now listed that as an optional "recommended" replacement. He stated that he did not know if the recommended repairs would comply with HUD regulations. Appellant then rested its case. After brief rebuttal testimony by Travis Drenning, the case was submitted to the jury.
 {¶ 24} The jury rendered a "verdict by answer to interrogatories" and found that:
 {¶ 25} 1) Blue Ribbon's admitted breach of contract directly and proximately caused damages claimed by appellees;
 {¶ 26} 2) Blue Ribbon had committed a breach of implied warranties;
 {¶ 27} 3) Blue Ribbon's breach of implied warranties directly and proximately caused damages claimed by appellees;
 {¶ 28} 4) Blue Ribbon did not breach any express warranties;
 {¶ 29} 5) Blue Ribbon committed unfair, deceptive, or unconscionable acts; *Page 13 
 {¶ 30} 6) Blue Ribbon's unfair, deceptive, or unconscionable acts directly and proximately caused damages to appellees;
 {¶ 31} 7) Blue Ribbon's admitted negligence directly and proximately caused damages claimed by appellees;
 {¶ 32} 8) The appropriate remedy is rescission plus damages;
 {¶ 33} 9) The damages to be awarded are $10,000; and
 {¶ 34} 10) Blue Ribbon violated the OCSPA and that the act was a "knowing" violation.
 {¶ 35} Pursuant to the jury verdict, the trial court awarded appellees $91,100 for rescission, and $10,000 in incidental damages, plus prejudgment and post-judgment interest. After conducting a hearing, the trial court also awarded appellees "$55, 067.76, plus an additional $500.00 for preparation and hearing held on December 22, 2005, plus an anticipated $1,575.00 to be paid to Plaintiffs' Expert, Mr. Willis, for seven hours time at $225.00 per hour." The court denied appellees' request for treble damages and offset the award by $5,000 received from their settlement with Commodore. The total award, excluding post-judgment interest, was $153, 242.76.[3]
 {¶ 36} Appellant, Blue Ribbon, now appeals from that judgment, arguing the following seven assignments of error: *Page 14 
 {¶ 37} "Assignment of Error No. 1:
 {¶ 38} "The trial court erred to the substantial prejudice of Blue Ribbon in admitting hearsay evidence as the cause of the frame damage.
 {¶ 39} "Assignment of Error No. 2:
 {¶ 40} "The trial court erred to the substantial prejudice of Blue Ribbon in substituting its own determination of damages for the amount awarded by the jury.
 {¶ 41} "Assignment of Error No. 3:
 {¶ 42} "The trial court erred to the substantial prejudice of Blue Ribbon in submitting claims under OCSPA for rescission and damages.
 {¶ 43} "Assignment of Error No. 4:
 {¶ 44} "The trial court erred to the substantial prejudice of Blue Ribbon in failing to direct a verdict on the OCSPA claims because the claims were time barred.
 {¶ 45} "Assignment of Error No. 5:
 {¶ 46} "The trial court erred to the substantial prejudice of Blue Ribbon in awarding attorney fees and expenses related to the attorney fee claim.
 {¶ 47} "Assignment of Error No. 6:
 {¶ 48} "The trial court erred to the substantial prejudice of Blue Ribbon in awarding treble damages.
 {¶ 49} "Assignment of Error No. 7:
 {¶ 50} "The trial court erred in entering its January 6, 2002 Nunc Pro Tunc order attempting to correct its error in calculating prejudgment interest." *Page 15 
 I. {¶ 51} In its first assignment of error, appellant contends that the trial court improperly admitted inadmissible hearsay when it permitted William Pobocik to testify as to the cause of frame damage to the home.
 {¶ 52} An appellate court's review is limited to the record presented before it. State v. Sugalski, 9th Dist. No. 02CA0054-M, 2002-Ohio-6767, ¶ 11. See, also, App.R. 9 and 12(A)(1)(b). An appellant has the burden of providing a record on appeal. Rose Chevrolet, Inc. v. Adams (1988),36 Ohio St.3d 17, 19. See, also, App.R. 9(B) and 10(A). "This duty falls upon the appellant because the appellant has the burden on appeal to establish error in the trial court." Sugalski, supra, ¶ 11, citingKnapp v. Edwards Laboratories (1980), 61 Ohio St.2d 197, 199. See, also App.R. 9(B). When the record is incomplete or unclear, an appellate court must presume the regularity of the trial court's proceedings and affirm its decision. Knapp, supra. See, also, Wozniak v. Wozniak (1993),90 Ohio App.3d 400, 409 (where portions of the record are omitted, which are necessary for effective review, the appellate court must affirm).
 {¶ 53} In this case, appellees filed a pretrial document regarding the admission of Pobocik's deposition testimony because he was not subject to subpoena and was therefore, "unavailable." Appellant objected to the use of this testimony. Although the record contains a plaintiffs' list of proposed pages, there is no specific ruling by the trial court as to which portions of the deposition were to be admitted. Appellant alleges in its brief that both parties designated pages to be included. During the pretrial discussion, *Page 16 
appellees' attorney referred to "highlighted sections we want." Further discussion was held regarding other parts of the deposition, but which were not specifically designated. Finally, the court ruled that it was admitting Pobocik's testimony, noting appellant's "exception." The trial transcript indicates that appellees' attorney then stated, "The only thing is we are going to have to modify the one spot to add that. I didn't put it in because it would be out for both parties [unintelligible]."
 {¶ 54} During trial, the court informed the jury that it had previously made "a preliminary ruling in this matter" and then gave a cautionary instruction. The court instructed that, although Pobocik might have given opinion testimony "regarding the structural integrity of a transverse beam," Pobocik's testimony was not to "be considered as expert, but only as a statement as to Commodore's position with regard to its liability or the needing for repair."
 {¶ 55} Despite the trial court's prior reference to needing "about five minutes to clean up the deposition," however, the trial transcript states that the "Deposition of Mr. William Pobocik is read into the record." There is no "trial exhibit" of the deposition, only the complete version which was filed in its entirety. Appellant's brief only refers generally to Pobocik's testimony and to a document admitted into evidence. Consequently, the record is unclear exactly which portions were ultimately read to the jury. Therefore, we are unable to review appellant's assignment of error for lack of a complete record, and we must presume the regularity of the trial court proceedings.
 {¶ 56} Accordingly, appellant's first assignment of error is not well-taken. *Page 17 
 II. {¶ 57} In its second assignment of error, appellant argues that the trial court erred by substituting its own determination of damages for the amount awarded by the jury. We disagree.
 {¶ 58} An appellate court generally must presume that the findings of the trier of fact are correct. Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 79-80. The trier of fact is in the best position to make factual findings, since it has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections which cannot be conveyed on appeal through the written record. Id., at 80; Miller v.Miller (1988), 37 Ohio St.3d 71, 74. "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Seasons Coal Co., supra, at 81. See, also, State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 59} The primary purpose of rescission is to restore the status quo and return the parties to their respective positions had the contract not been formed. Rosepark Properties, Ltd. v. Buess,167 Ohio App.3d 366, 2006-Ohio-3109, ¶ 51, citing to Mid-America Acceptance Co. v.Lightle (1989), 63 Ohio App.3d 590. "[Rescission is not merely a termination of the contract; it is an annulment of the contract. * * * Returning the parties to the status quo is an integral part of rescission, and in doing so it is generally necessary to award the party seeking rescission at least his out-of-pocket expenses." Mid-AmericaAcceptance Co., supra, at 599. See, also, Sabbatis v. Burkey, *Page 18 166 Ohio App.3d 739, 2006-Ohio-2395 (under rescission claim, plaintiff entitled to incidental damages for loss not cured by cancellation of the contract).
 {¶ 60} In this case, by agreement of the parties, the jury was given three choices in deciding what to award to appellees: rescission, rescission plus damages, and damages. The jury chose to award appellees with rescission plus $10,000 in damages. Expert testimony was specifically provided that the cost of rescission would be $91,100. In addition, testimony was presented that appellees had expended funds for other expenses related to the home installation, and would not be wholly compensated by merely removing the home.
 {¶ 61} In its judgment entry, the trial court awarded appellees $91,100 for rescission and $10,000 for damages, in accordance with the amount presented to and awarded by the jury. The court then offset this amount by the $5,000 which appellees received from their settlement with Commodore. Even under the theory that appellees had elected rescission under the OCSPA as their sole remedy, they were entitled to the cost of the rescission plus any out-of-pocket expenses to place them in the same position they would have been in before they entered into the contract. Since the trial court's award of damages was directly based upon the jury determination, we cannot say that the trial court erred in the amount designated in its judgment entry.
 {¶ 62} Accordingly, appellant's second assignment of error is not well-taken. *Page 19 
 III. {¶ 63} In its third assignment of error, appellant contends that the trial court erred by submitting claims to the jury under OCSPA for rescission and damages.
 {¶ 64} R.C. 1345.02(A) states:
 {¶ 65} "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."
 {¶ 66} The intent of the OSCPA was "to prevent unfair, deceptive, and unconscionable acts and practices, to provide strong and effective remedies, both public and private, to assure that consumers will recover any damages caused by such acts and practices, and to eliminate any monetary incentives for suppliers to engage in such acts and practices." Am. Sub. H.B. No. 681, 137 Ohio Laws, Part II, 3219.
 {¶ 67} As we noted previously, rescission may be accompanied by an award of incidental damages in order to make a party whole. SeeMid-America Acceptance Co. v. Lightle (1989), 63 Ohio App.3d 590, 599. Thus the award of rescission (the cost of removing the home) and other damages incidental to its removal, such as out-of-pocket costs for landscaping, improvements, or other expenses would be appropriate to place a party back in the position he or she would have been in prior to the contract. Id.
 {¶ 68} Moreover, failure to object to jury instruction at a time when the trial court could have corrected any claimed error constitutes a waiver of the right to assign as error the giving of that instruction. See Civ.R. 51(A); Schade v. Carnegie Body Co. (1982), *Page 20 70 Ohio St.2d 207, paragraph one of the syllabus. Consequently, a party will not be allowed "to take advantage of an error which he himself invited or induced the trial court to make." Hinkle v. Cleveland ClinicFound., 159 Ohio App.3d 351, 2004-Ohio-6853, ¶ 49, citing to State exrel. Bitter v. Missig (1995), 72 Ohio St.3d 249, 254 and State ex rel.Fowler v. Smith (1994), 68 Ohio St.3d 357, 359.
 {¶ 69} In this case, appellant admitted liability for appellees' negligence and breach of contract claims. Essentially, regarding the damages incurred, the only decision before the jury was how to best compensate for appellant's actions. To assist the jury and provide specific information about their decision, they were given 12 interrogatories. Nothing in the record indicates that appellant objected to the use of the jury interrogatories which gave three choices: rescission, rescission plus damages, and damages.[4] According to the discussion with the court, appellant's counsel, in fact, provided the text for many of the interrogatories.
 {¶ 70} According to the interrogatory answers, the jury found that appellant's breach of contract and negligence proximately caused damage to appellees. The jury further found that appellant had breached implied warranties and committed unfair, deceptive, unconscionable acts which directly and proximately caused damages to appellees. In accordance with the choices provided, the jury then awarded appellees *Page 21 
rescission and $10,000 in damages. Therefore, we conclude that appellant's argument regarding an error in the jury award is without merit.
 {¶ 71} Accordingly, appellant's third assignment of error is not well-taken.
 IV. {¶ 72} Appellant, in its fourth assignment of error, claims that the trial court erred in denying its motion for directed verdict on the OCSPA claims because they were time barred. Again, we disagree.
 {¶ 73} A directed verdict is properly granted when "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party [.]" Civ.R. 50(A)(4). Thus, a motion for a directed verdict assesses the sufficiency of the evidence, not the weight of the evidence or the credibility of the witnesses. Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, 68, citing Rohde v. Farmer (1970), 23 Ohio St.2d 82, 91. An appellate court reviews a trial court's ruling on a motion for a directed verdict de novo, as it presents a question of law. Schafer v.RMS Realty (2000), 138 Ohio App.3d 244, 257, citing Nichols v.Hanzel (1996), 110 Ohio App.3d 591, 599.
 {¶ 74} Civ.R. 8(C) provides that "a party shall set forth affirmatively * * * statute of limitations * * * and any other matter constituting an avoidance or affirmative defense." As an affirmative defense "other [than] those listed at Civ.R. 12(B)," the statute of limitations defense is waived if not raised in the pleadings or by an amendment *Page 22 
to the pleadings. Jim's Steak House, Inc. v. Cleveland (1998),81 Ohio St.3d 18, 20. Furthermore, R.C. 1345.02(A) states:
 {¶ 75} "No supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."
 {¶ 76} In this case, appellant failed to assert the statute of limitations affirmative defense in its answer and did not file any amendments to its answer. Consequently, we conclude that it waived the statute of limitations defense and appellees' OCSPA claims were not time-barred. Moreover, the facts support the conclusion that Blue Ribbon's actions constituted a continuous OCSPA violation during the years leading up to the filing of suit. Therefore, the trial court did not err in denying appellant's motion for directed verdict based upon a statute of limitations claim.
 {¶ 77} Accordingly, appellant's fourth assignment of error is not well-taken.
 V. {¶ 78} In its fifth assignment of error, appellant claims that the trial court erred in awarding to appellees a sum for attorney fees and related expenses of suit.
 {¶ 79} R.C. 1345.09 (F) provides, in pertinent part, that:
 {¶ 80} "(F) The court may award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed, if either of the following apply:
 {¶ 81} "* * * *Page 23 
 {¶ 82} "(2) The supplier has knowingly committed an act or practice that violates this chapter."
One can "knowingly" commit a deceptive act in violation of the OCSPA without "knowing that the act is in violation of the law." Borror v.MarineMax of Ohio, Inc., 6th Dist. No. OT-06-010, 2007-Ohio-562, ¶ 50;Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc. (1985), 23 Ohio App.3d 85,90. The legislative purpose of R.C. 1345.09(F)(2) is best safeguarded "by finding that `knowingly' committing an act or practice in violation of R.C. Chapter 1345 means that the supplier need only intentionally do the act that violates the Consumer Sales Practices Act." Einhorn v. FordMotor Company (1990), 48 Ohio St.3d 27, 30. Furthermore, "[t]he supplier does not have to know that his conduct violates the law for the court to grant attorney fees." Id.
 {¶ 83} Proof of intent to deceive is not required to establish a violation of R.C. 1345.02. It is sufficient that the conduct complained of "has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts." Funk v. MontgomeryAMC/Jeep/Renault (1990), 66 Ohio App.3d 815, 823. Whether deception was present is determined by the consumer's state of mind, rather than the intent of the supplier. Thompson v. Jim Dixon Lincoln Mercury, Inc.
(Apr. 27, 1983), 12th Dist. No. 82-11-0109.
 {¶ 84} A trial court's determination as to the amount of attorney fees awarded for a knowing violation of the OCSPA should not be reversed absent a showing that the court abused its discretion. Bittner, supra. An abuse of discretion is more than an error of *Page 24 
judgment or law; it implies the trial court's decision is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1985),5 Ohio St.3d 217, 219. "Unless the amount of fees determined is so high or so low as to shock the conscience, an appellate court will not interfere."Bittner, supra, at 146, quoting Brooks v. Hurst Buick-Pontiac-Olds-GMC,Inc. (1985), 23 Ohio App.3d 85, 91.
 {¶ 85} In the present case, the jury specifically determined that appellant's act was a "knowing violation" of the OCSPA. As a result, under the OCSPA, appellees were entitled to an award of attorney fees. Since appellant failed to include a transcript of the hearing regarding the evidence as to the reasonableness of the attorney fees, we must presume the regularity of the trial court's determination of the amount of fees awarded. Therefore, the trial court's award of attorney fees was proper.
 {¶ 86} Accordingly, appellant's fifth assignment of error is not well-taken.
 VI. {¶ 87} In its sixth assignment of error, appellant argues that the trial court erred in "awarding treble damages" to appellees.
 {¶ 88} In this case, the final judgment entry states that "had Plaintiffs elected to proceed on a `damages' only claim, then treble damages would and ought to be have been [sic] awarded. However, since Plaintiffs elected to proceed on their cause for `rescission,' Plaintiffs are now limited to an Award, after setting off the $5,000.00 received, and exclusive of interest of rescission plus $153,242.76." *Page 25 
 {¶ 89} The judgment entry clearly indicates that the trial court denied any request for treble damages. Therefore, we conclude that appellant's sixth assignment of error is wholly without merit.
 {¶ 90} Accordingly, appellant's sixth assignment of error is not well-taken.
 VII. {¶ 91} In its seventh assignment of error, appellant asserts that the trial court erred when it sought to correct its error in calculating prejudgment interest in its January 6, 2002 Nunc Pro Tunc order.
 {¶ 92} Civ.R. 60(A) provides that:
 {¶ 93} "A nunc pro tunc order may be issued by a trial court, as an exercise of its inherent power, to make its record speak the truth. It is used to record that which the trial court did, but which has not been recorded. It is an order issued now, which has the same legal force and effect as if it had been issued at an earlier time, when it ought to have been issued. Thus, the office of a nunc pro tunc order is limited to memorializing what the trial court actually did at an earlier point in time. It can be used to supply information which existed but was not recorded, to correct mathematical calculations, and to correct typographical or clerical errors. * * *" (Emphasis added.) Thus, a trial court retains jurisdiction to "correct clerical errors in judgment."State ex rel. Cruzado v. Zaleski, 111 Ohio St.3d 353, 2006-Ohio-5795, ¶ 19. "The term `clerical mistake' refers to a mistake or omission, mechanical in nature and apparent on the record, which does not involve a *Page 26 
legal decision or judgment." Cruzado, supra, citing State v. Brown
(2000), 136 Ohio App.3d 816, 819-20.
 {¶ 94} In this case, the nunc pro tunc judgment entry did not add anything that was not decided by the trial court; both entries provided for an award of prejudgment interest. The first entry mistakenly indicated that the amount of interest on the $101,100 award was "$138,086.00." The nunc pro tunc entry corrected this state that the interest was "$36,986.00" It is clear that in the original judgment entry, the court added the $101,100 award amount and the interest of $36,986, and then mistakenly designated the total, $138,086, as the amount of prejudgment interest. This resulted in a mathematical error which added more than $100,000 to the amount of the original award. Consequently, the nunc pro tunc entry simply corrected the mathematical error, which, in fact, substantially lowered the final award. Therefore, since this correction is exactly the type of clerical error contemplated by Civ.R. 60(A), the trial court's use of a nunc pro tunc judgment entry to correct the prejudgment interest amount was proper.
 {¶ 95} Accordingly, appellant's seventh assignment of error is not well-taken.
 {¶ 96} The judgment of the Fulton County Court of Common Pleas is affirmed.
 {¶ 97} Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Fulton County.
 JUDGMENT AFFIRMED. *Page 27 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Mark L. Pietrykowski, P.J., Arlene Singer, J., William J. Skow, J., CONCUR.
[1] If installed according to plans, the house was designed to conform to standards required by the United States Department of Housing and Urban Development.
[2] Although discussion between the court and counsel indicates that the parties designated only portions of Pobocik's deposition to be read, nothing in the record indicates exactly which parts were included and which were not. Therefore, we will only generally describe his testimony.
[3] These final amounts were entered on a "nunc pro tunc" judgment entry after the parties alerted the court to a mathematical error in the original judgment entry.
[4] Appellant asserts in its brief that the court failed to record a discussion which included its objections. Appellant took no action pursuant to App.R. 9(C) to request the addition of those facts to the record. Without a complete record before us, we may not presume that such objection was made. *Page 1