**COMPLETE GENERAL CONSTRUCTION CO., Appellant,**

v.

**KARD WELDING, INC., d.b.a. Kard Bridge Products, Appellee.**

[Cite as *Complete Gen. Constr. Co. v. Kard Welding,
Inc.,* 182 Ohio App.3d 119, 2009-Ohio-1861.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 08AP–556.

Decided April 21, 2009.

Bricker & Eckler L.L.P., and Christopher L. McCloskey, for appellant.

Coolidge Wall Co., L.P.A., Christopher R. Conard, and Maureen S. Hinson, for appellee.

FRENCH, Presiding Judge.

{¶ 1} Plaintiff-appellant, Complete General Construction Company ("Complete General"), appeals from the judgment of the Franklin County Court of Common Pleas in favor of defendant-appellee, Kard Welding, Inc., d.b.a. Kard Bridge Products ("Kard"). We affirm.

{¶ 2} On November 20, 2002, the Ohio Department of Transportation ("ODOT") requested bid proposals for Project No. 020508 ("ODOT project"), which involved the construction of a highway on-ramp and off-ramp for State Route 315, north of King Avenue, in Columbus. Bids were required to be sealed and submitted to ODOT by December 6, 2002, at 10:00 a.m.

{¶ 3} In anticipation of submitting a bid for the ODOT project, Complete General solicited quotes from prospective subcontractors, including subcontrac-

tors for the project's structural steel components. On December 5, 2002, at approximately 9:30 p.m., Kard faxed a quote (the "original quote") to Complete General for the structural steel components, including prices for seven line items set forth in the ODOT project requirements. Of particular relevance to this appeal, Kard's original quote included a price of $259,260 for line item 0360.

{¶ 4} The original quote stated that it was "FIRM FOR 30 DAYS" from December 6, 2002, included a term requiring payment *"NET 30* [days] *FROM INVOICE DATE,"* and provided that "ALL 863 MATERIAL SHOP DRAW-INGS SHALL BE STAMPED AND DATED AS CHECKED AND ACCEPT-ED BY A REGISTERED PROFESSIONAL ENGINEER HIRED BY [Complete General]." [1] The original quote also included the Kard Group Standard Terms and Conditions of Sale, which provided:

> Acceptance of any order from [Complete General] for purchase of materials or services or both is expressly made conditional on [Complete General's] assent to the terms and conditions of sale contained in [Kard's] Quotation, in [Kard's] Acknowledgment, and in these "Kard Group Standard Terms and Conditions of Sale", and [Kard] agrees to furnish materials and/or services only upon these conditions.

The original quote does not contain a handwritten signature, but contains the following typewritten notation directly above the Kard Group Standard Terms and Conditions: "KENNETH OSTERLOH / VICE PRESIDENT / KARD BRIDGE."

{¶ 5} On December 6, 2002, at approximately 7:53 a.m., Dave Anderson, a Complete General estimator, spoke with Ken Osterloh, who confirmed Kard's original quote and confirmed that Kard could meet Complete General's anticipated delivery schedule. After speaking with Osterloh, and based on Kard's original quote, Complete General deducted $89,390 from its bid to ODOT. After making this deduction, Complete General submitted its bid to ODOT at approximately 9:45 a.m. on December 6, 2002.

{¶ 6} After ODOT opened the bids on December 6, 2002, Complete General learned that it was the apparent low bidder. ODOT officially awarded Complete General the general contract on December 19, 2002.

{¶ 7} At all relevant times, it was Complete General's practice to issue a purchase order to a subcontractor when it agreed on terms and wished to enter into a formal contract. On December 18, 2002, Anderson faxed a copy of Complete General's standard "TERMS AND CONDITIONS" to Osterloh with a

---

1. ODOT Supplemental Specification 863.08 requires a contractor to submit shop drawings for structural steel components to the Office of Structural Engineering and requires that those drawings be approved by a registered professional engineer.

cover sheet stating, "[Those terms and conditions] would be made part of our [purchase order] to you and would replace your terms. Please review and advise. Payment would be as we discussed, prompt!" For the next several weeks, Complete General and Kard engaged in negotiations concerning the terms and conditions that would govern a subcontract for the structural steel components. Particular disagreements related to the terms for payment and a term regarding which party bore the risk for the professional engineer's review of Kard's shop drawings. Complete General never issued a purchase order or subcontract to Kard in relation to the ODOT project.

{¶ 8} On January 7, 2003, as part of the parties' continuing negotiations over terms, Osterloh faxed Anderson a set of revised terms and conditions that restated Kard's prices for the relevant line items and proposed an increase in Kard's selling price in exchange for Kard's maintaining continued liability for errors in the shop drawings overlooked during the professional engineer's review. Upon review of this fax, Anderson noticed that Kard was working off a price for line item 0360 different from that listed in the original quote. After questioning Osterloh, Anderson learned that Kard had submitted a revised quote to Complete General, via fax, shortly after 9:30 a.m. on December 6, 2002, based on a mistake in the original bid. The revised quote increased the price for line item 0360 by $24,890. Anderson did not learn of the revised quote until he received Osterloh's January 7, 2003 fax, more than 30 days later.

{¶ 9} On January 16, 2003, after learning of the revised quote and of Kard's refusal to honor the original quote for line item 0360, Complete General submitted a purchase order and entered into a subcontract for the structural steel components of the ODOT project with PDM Bridge, L.L.C. ("PDM"), in the amount of $570,000.

{¶ 10} On March 19, 2003, Complete General filed a complaint against Kard in the Franklin County Court of Common Pleas. After a stipulated dismissal without prejudice on March 3, 2004, Complete General refiled its complaint on March 2, 2005, asserting claims for breach of contract, promissory estoppel, and detrimental reliance. Kard filed an answer on April 22, 2005, along with a counterclaim for a declaratory judgment and breach of contract. On January 25, 2007, the trial court denied a motion for summary judgment filed by Complete General.

{¶ 11} Pursuant to an order of reference, a magistrate conducted a jury-waived trial on several nonconsecutive days between January 31, 2007, and March 16, 2007. On the final day of trial, Kard withdrew its counterclaim. The magistrate issued his decision, including findings of fact and conclusions of law, on April 26, 2007, finding in favor of Kard. The magistrate rejected Complete General's argument that the original quote was a firm offer under R.C. 1302.08. The

magistrate also concluded that Complete General's promissory-estoppel claim failed because Complete General was not seeking performance from Kard in accordance with the terms of the original quote and because Complete General did not notify Kard within a reasonable time that it was accepting the original quote.

{¶ 12} Complete General filed timely objections to the magistrate's decision on May 10, 2007, and filed supplemental objections on March 4, 2008. The trial court overruled Complete General's objections, adopted the magistrate's decision, and entered judgment in favor of Kard on June 3, 2008. Complete General thereafter filed a timely notice of appeal.

{¶ 13} Complete General asserts the following assignments of error:

**Assignment of Error No. 1:** Kard's Original Quote constituted a firm offer under Ohio Revised Code § 1302.08 and was irrevocable.

**Assignment of Error No. 2:** The trial court erred in ruling that Kard was not obligated to honor its Original Quote submitted to Complete General.

Complete General maintains that the trial court's judgment is contrary to law and must be reversed.

{¶ 14} When reviewing a trial court's judgment following a bench trial, an appellate court should be " 'guided by a presumption that the findings of the trier-of-fact were indeed correct.' " *Rosepark Properties, Ltd. v. Buess,* 167 Ohio App.3d 366, 2006-Ohio-3109, 855 N.E.2d 140, ¶ 18, quoting *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273. If the judgment is supported by " 'some competent, credible evidence going to all the essential elements of the case,' " an appellate court may not reverse the judgment as being against the manifest weight of the evidence. *Seasons Coal* at 80, 10 OBR 408, 461 N.E.2d 1273, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. In contrast to determinations of fact, which are accorded considerable deference, questions of law are reviewed de novo. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684.

{¶ 15} In its first assignment of error, Complete General contends that the trial court erred by concluding that the original quote was not a firm offer. R.C. 1302.08 discusses firm offers and provides:

An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months * * *.

Kard's original quote states: "THIS QUOTATION IS FIRM FOR 30 DAYS FROM [December 6, 2002] UNLESS OTHERWISE NOTED BELOW" and contains no contradictory language. Therefore, Complete General maintains that the original quote was a firm offer and that Kard violated R.C. 1302.08 by attempting to revoke the original quote when it faxed its revised quote the following day. Accordingly, Complete General contends that Kard became immediately liable for Complete General's cover costs.

{¶ 16} The magistrate concluded, in a footnote, that the original quote was not a firm offer because it was not signed, as required by R.C. 1302.08. On appeal, Complete General argues that the original quote was signed. Complete General also argues that it lacked a legitimate opportunity to accept the original quote, based on testimony by Osterloh that he did not intend to be bound by the original price. In response, Kard argues that the Uniform Commercial Code ("UCC"), as codified in R.C. Chapter 1302, does not apply to its original quote and that even if the UCC applies and even if its original quote was a firm offer, Complete General did not accept the original quote within the period of irrevocability. Thus, Kard maintains that no contract was formed between the parties and that Complete General may not recover its cover costs.

{¶ 17} Complete General maintains that it is entitled to cover costs under R.C. 1302.86. R.C. 1302.86(A) provides that after a seller breaches, "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." R.C. 1302.86(B) provides, "The buyer may recover from the seller as damages the difference between the cost of cover and the contract price," along with certain incidental and consequential damages, but less expenses saved because of the seller's breach. Thus, R.C. 1302.86 expressly presupposes a contractual relationship between the buyer and seller, stating that a buyer may cover after a seller's breach. It is fundamental that the formation of a contract requires an offer, acceptance of the offer, and consideration. *Callander v. Callander*, 10th Dist. No. 07AP–746, 2008-Ohio-2305, 2008 WL 2026431, ¶ 14, citing *Hoyt v. Nationwide Mut. Ins. Co.*, 10th Dist. No. 04AP–941, 2005-Ohio-6367, 2005 WL 3220192, ¶ 40. Absent a contract between the parties, there can be no breach. *Collins v. Flowers*, 9th Dist. No. 04CA008594, 2005-Ohio-3797, 2005 WL 1763615, ¶ 52.

{¶ 18} Assuming, without deciding, that the UCC applies and that the original quote constituted a firm offer, we agree that Complete General's claim would nevertheless fail because Complete General did not accept either Kard's original or revised quote, and, therefore, there was no contract between the parties. Kard's original quote was dated December 6, 2002. If, as Complete General argues, the original quote was a firm offer, Complete General was

entitled to accept it within 30 days from December 6, 2002, regardless of Complete General's attempt to revoke the quote by issuing a revised quote. At the expiration of the 30–day period of irrevocability, Complete General, although still unaware of the revised quote, had not acted to accept Kard's original quote by issuing a purchase order. Rather, the parties continued to negotiate the terms and conditions that would govern any contractual relationship that developed between them.

{¶ 19} Complete General contends that it did not have a real opportunity to accept the original quote based on Osterloh's trial testimony that once he had sent out the revised quote, he did not intend to honor the price for line item 0360 in the original quote. Osterloh maintained that once he sent the revised quote, the original quote was "obsolete" and "void." Osterloh also testified that if Complete General had sent Kard a purchase order on the original quote, Kard "would have talked about thirty days, that's for sure." We reject Complete General's argument that it was not required to accept Kard's original quote because acceptance would have been in vain. Despite Osterloh's subsequent testimony that Kard would have contested its obligation to honor the original quote, Complete General had ample opportunity to accept the original quote within the 30 days that that quote was purportedly firm. Complete General's argument to the contrary is especially disingenuous here, where Complete General remained unaware of the revised quote during the entire 30–day period set forth in the original quote. Thus, price was not even an issue in the parties' negotiations until after the original quote had ostensibly expired, and the price discrepancy accordingly played no role in Complete General's failure to accept Kard's original quote. Upon review, we conclude that Osterloh's after-the-fact testimony does not negate the requirement that Complete General was required to accept Kard's offer before seeking cover damages from Kard.

{¶ 20} Ultimately, we find Complete General's first assignment of error moot because, even had Kard's original quote been firm for 30 days, Complete General did not accept that quote. Therefore, we overrule Complete General's first assignment of error.

{¶ 21} In its second assignment of error, Complete General asserts that the trial court erred in determining that Kard was not obligated to honor its original quote under Kard's claims of promissory estoppel and detrimental reliance. Ohio does not recognize a cause of action for detrimental reliance. *Carpenter v. Scherer–Mountain Ins. Agency* (1999), 135 Ohio App.3d 316, 327, 733 N.E.2d 1196, fn. 3, citing *Gottfried–Smith v. Gottfried* (1997), 119 Ohio App.3d 646, 650, 695 N.E.2d 1229. "Detrimental reliance arises as an *element* of various causes of action (*e.g.* promissory estoppel, misrepresentation) but is not a cause of action unto itself." (Emphasis sic.) Id. Here, the allegations in

Complete General's claims for promissory estoppel and detrimental reliance are nearly identical, and we will address those claims together as a claim for promissory estoppel based on Complete General's alleged detrimental reliance on Kard's original quote.

{¶ 22} The doctrine of promissory estoppel provides that " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' " *Gralewski v. Bur. of Workers' Comp.*, 167 Ohio App.3d 468, 2006-Ohio-1529, 855 N.E.2d 879, ¶ 47, quoting Restatement (Second) of Contracts (1981), Formation of Contracts–Consideration, Section 90; *McCroskey v. State* (1983), 8 Ohio St.3d 29, 30, 8 OBR 339, 456 N.E.2d 1204.

{¶ 23} An early and seminal case applying the doctrine of promissory estoppel in the context of construction bidding is *Drennan v. Star Paving Co.* (1958), 51 Cal.2d 409, 333 P.2d 757. In that case, the defendant subcontractor submitted the lowest bid for the paving portion of a construction project. The same day, the plaintiff general contractor incorporated the defendant's bid into its own bid. The morning after the plaintiff was awarded the general contract, he stopped at the defendant's office, whereupon the defendant's construction engineer stated that the defendant had made a mistake and would not honor its bid. The plaintiff responded that he expected the defendant to perform in accordance with its bid because the plaintiff had used the defendant's bid and was awarding the contract to the defendant. The Supreme Court of California found no evidence that the defendant, by its bid, made an option contract, supported by consideration. Nor did the court find evidence that warranted interpreting the plaintiff's use of the defendant's bid as an acceptance. Nevertheless, the court affirmed the judgment in favor of the plaintiff for the difference between the defendant's bid and the plaintiff's ultimate cost for the paving.

{¶ 24} *Drennan*, 51 Cal.2d 409, 333 P.2d 757, expressed the question presented as whether the plaintiff's reliance made the defendant's offer irrevocable. Based on the Restatement of Contracts (1932), Formation of Informal Contracts, Section 90, the court stated that the defendant's bid "constituted a promise to perform on such conditions as were stated expressly or by implication therein or annexed thereto by operation of law" and that the "[d]efendant had reason to expect that if its bid proved the lowest it would be used by [the] plaintiff." Id. at 413, 333 P.2d 757. The court analogized the scenario to an offer for a unilateral contract, which becomes irrevocable once part of the requested performance has been performed because the main offer includes an implied, subsidiary promise that the offeror will not revoke his offer, the part performance furnishing consideration for the subsidiary promise. Thus, the court held that "[r]easonable

reliance resulting in a foreseeable prejudicial change in position affords a compelling basis also for implying a subsidiary promise not to revoke an offer for a bilateral contract," the reasonable reliance serving to hold the offeror to his offer in lieu of consideration. Id. at 414, 333 P.2d 757. The *Drennan* analysis recognized and attempted to curb the unfairness that may result from applying traditional contract principles, i.e., that an offer may be withdrawn at any time before it is accepted, in a construction bidding context.

{¶ 25} In *Drennan*, 51 Cal.2d at 415, 333 P.2d 757, the court held as follows: When plaintiff used defendant's offer in computing his own bid, he bound himself to perform in reliance on defendant's terms.  * * * Defendant had reason not only to expect plaintiff to rely on his bid but to want him to. Clearly defendant had a stake in plaintiff's reliance on its bid.  Given this interest and the fact that plaintiff is bound by his own bid, it is only fair that plaintiff should have at least an opportunity to accept defendant's bid after the general contract has been awarded to him.

The promissory estoppel in *Drennan*, resulting from the plaintiff's use of the defendant's quote in its own bid, did not create an enforceable contract for the paving work.  Indeed, the court stated that a general contractor may not delay *acceptance* of a subcontractor's offer after being awarded the general contract in hopes of obtaining a better offer while claiming a continuing right to rely on the subcontractor's original offer.  Thus, while promissory estoppel prevented the defendant from revoking its offer before the plaintiff had an opportunity to accept it, the defendant was only bound to perform in accordance with its offer once the plaintiff accepted.  In that case, the plaintiff promptly informed the defendant that the plaintiff had been awarded the general contract and that the plaintiff was awarding the subcontract to the defendant, thus binding the defendant to perform.  The effect of the promissory estoppel was solely to preclude the defendant from denying the contract based on a claim that it had withdrawn the offer prior to acceptance.

{¶ 26} Although not mentioning promissory estoppel, the Eighth District Court of Appeals relied on *Drennan* in *Wargo Builders, Inc. v. Douglas L. Cox Plumbing & Heating, Inc.* (1971), 26 Ohio App.2d 1, 55 O.O.2d 23, 268 N.E.2d 597. At paragraph two of the syllabus, the court held as follows:

A subcontractor who makes a "bid" or "quote" which constitutes an offer to a general contractor, who submits a bid in reliance upon such offer, is bound to perform in accordance with the terms of that offer when the general contractor (1) is awarded the contract and (2) within a reasonable time thereafter notifies the subcontractor that the offer is accepted.  Under such circumstances the subcontractor is liable in damages to the general contractor for failure to perform.

In *Wargo,* the court faced a factual scenario nearly identical to that in *Drennan,* in that the defendant subcontractor demanded additional money to perform after the plaintiff general contractor included the defendant's bid in its own bid, but before the plaintiff had accepted the defendant's bid. After the defendant demanded additional money, the plaintiff accepted the defendant's original offer by sending a telegram demanding performance at the originally stated price. The court stated that the defendant's bid was an offer to perform, upon which the plaintiff reasonably and foreseeably relied in submitting its own bid. Under those circumstances, the court stated that it would be unreasonable to permit the defendant to revoke its offer until the plaintiff had a reasonable time after award of the general contract to accept the offer. Based on *Drennan, Wargo* held that the defendant was required to keep his original offer open for a reasonable time, but that the defendant "could not be bound to perform * * * unless the general contractor accepted [the] offer." Id. at 4, 55 O.O.2d 23, 268 N.E.2d 597. Thus, like in *Drennan,* the plaintiff's acceptance of the defendant's offer remained the paramount concern regarding whether the defendant was bound to perform. *Wargo* found sufficient circumstances to show that the plaintiff, in fact, had accepted the defendant's offer, thus binding the defendant to perform and rendering the defendant liable in damages for his failure to do so.

{¶ 27} More recently, the Eighth District Court of Appeals discussed the *Wargo* holding in terms of promissory estoppel. See *R.P. Carbone Constr. Co. v. N. Coast Concrete, Inc.* (1993), 88 Ohio App.3d 505, 624 N.E.2d 326. *Carbone* noted that both *Drennan* and *Wargo* "recognize that the subcontractor is bound only by the terms of its original offer." In *Carbone,* based on negotiations between the plaintiff general contractor and the defendant subcontractor regarding the price and the scope of the work, the trial court concluded that the plaintiff never accepted the subcontractor's original offer, as represented by its bid. Because the promissory-estoppel theory espoused by *Drennan* and *Wargo* binds a subcontractor to perform only when the general contractor has accepted the subcontractor's offer within a reasonable time, *Carbone* held that the subcontractor was not required to perform. The requirement of acceptance prevents the injustice that may result when a subcontractor is obligated to perform based on the general contractor's incorporation of the subcontractor's bid into its own bid, but where the general contractor is not obligated to award the job to the subcontractor.

{¶ 28} In this case, Complete General reasonably and foreseeably relied on Kard's offer to perform, as set forth in Kard's original quote, to the extent that it incorporated the original quote in its own bid. As a result, in accordance with *Drennan* and *Wargo,* Kard was obligated to keep its original quote open for acceptance by Complete General for a reasonable time after ODOT awarded the

general contract to Complete General. Accordingly, we conclude that Kard's revised quote, which Kard sent less than a half-hour before Complete General's sealed bid was due and which Complete General did not learn of until over a month later, was ineffective to revoke the original quote. Nevertheless, Kard was not bound to perform under its original quote unless Complete General accepted its offer.

{¶ 29} A general contractor's mere use of a subcontractor's quote in formulating a bid for a general contract does not constitute acceptance of the subcontractor's offer. See *Drennan; Wargo.* Anderson's own trial testimony aptly demonstrates that Complete General's use of Kard's original quote did not constitute an acceptance sufficient to bind the parties. Anderson testified that Complete General's use of Kard's bid did not mean that it would ultimately award Kard the subcontract. Although it was Complete General's practice to issue a purchase order to a subcontractor when it desired to enter into a contract, Complete General did not submit a subcontract or a purchase order to Kard. Moreover, Anderson did not even recall notifying Kard that Complete General was going to award it the contract, stating: "I don't think I ever told Ken [Osterloh] that he had the job." To the contrary, uncomfortable with the terms and conditions included with Kard's original quote, Complete General attempted to negotiate the terms and conditions that would govern any subcontract between the parties. On December 18, 2002, Complete General sent Kard a copy of Complete General's standard terms and conditions with a note stating that those terms and conditions would be made part of any purchase order issued to Kard and asking Kard to "review and advise." Complete General's own note establishes that there was no meeting of the minds and intent to be bound.

{¶ 30} Additional evidence that Complete General did not intend to be bound exists in Anderson's testimony that despite including Kard's original quote in its bid to ODOT, Complete General continued to negotiate bids submitted by other structural steel subcontractors in the hope that those subcontractors would reduce their bids. In fact, it is Complete General's customary practice to contact other subcontractors to determine whether they are willing to reduce their bids before Complete General awards a subcontract, a tactic commonly referred to as bid-shopping. Bid-shopping is defined as "[a] general contractor's effort—after being awarded a contract—to reduce its own costs by finding a subcontractor that will submit a lower bid than the one used in calculating the total contract price." Black's Law Dictionary (8th Ed.2004) 172. Complete General's admission of engaging in this practice belies its assertion that it accepted Kard's original quote or continued to rely on that quote beyond including it in its bid.

{¶ 31} Despite the absence of any evidence that it had accepted Kard's original quote and despite its proposition of materially different terms and conditions,

Complete General maintains that Kard was required to abide by its original quote. Complete General's argument hinges on *Lichtenberg Constr. & Dev., Inc. v. Paul W. Wilson, Inc.* (Mar. 10, 2000), 1st Dist. No. C–990533, 2000 WL 33250695, which it contends expanded the *Wargo* holding to permit a general contractor to propose terms and conditions different from those contained in the subcontractor's bid while still holding the subcontractor to its bid. In that case, on March 17, 1998, the subcontractor, Wilson, made a bid to the general contractor, Lichtenberg, and Lichtenberg used Wilson's bid in submitting its own bid. On April 29, 1998, Lichtenberg received a signed general contract, and on April 29 or 30, 1998, Lichtenberg orally informed Wilson that it intended to enter into a subcontract with Wilson. On May 4, 1998, Lichtenberg sent Wilson a subcontract, which Wilson refused to execute because it contained disagreeable terms. The trial court concluded that Wilson was not obligated to honor its bid because Lichtenberg did not give Wilson timely notice that it intended to use Wilson as its subcontractor. The appellate court reversed after considering the timeliness of Lichtenberg's notice to Wilson and the reasonableness of Lichtenberg's proposed terms.

{¶ 32} *Lichtenberg* reaffirmed, as the applicable law, the *Wargo* rule that a subcontractor is bound to perform in accordance with its bid when the general contractor submits a bid in reliance on the subcontractor's bid, the general contractor is awarded the contract, and the general contractor notifies the subcontractor within a reasonable time that the subcontractor's offer is accepted. *Lichtenberg* then stated as follows:

> Here, the second part of the rule is at issue: whether Lichtenberg gave Wilson notice within a reasonable time that Wilson's offer, or bid, was accepted. In other words, did Lichtenberg inform Wilson within a reasonable time that Lichtenberg intended to enter into a subcontract with Wilson?

In analyzing the second part of the *Wargo* rule, the court concluded that the starting point for determining the reasonableness of Lichtenberg's notice to Wilson should have been the date that the project owner awarded the general contract, not the date of Wilson's bid, because a general contractor cannot enter into a subcontract until it has been awarded the general contract. Because Lichtenberg orally notified Wilson that it intended to enter into a subcontract with Wilson within one day after receiving notice that it had been awarded the general contract, the court held that Lichtenberg notified Wilson within a reasonable time. Nevertheless, the court determined that an issue remained as to whether the terms of Lichtenberg's subcontract were reasonable.

{¶ 33} Wilson argued that it did not execute, and was not required to execute, Lichtenberg's subcontract because it included disagreeable and unreasonable terms, which Lichtenberg refused to negotiate. The court stated, "[I]f the

general contractor * * * proposes a subcontract with terms that the subcontractor should not reasonably have expected when the subcontractor made the bid, then the subcontractor will not be obligated to honor the bid." *Lichtenberg.* Because the trial court had not addressed the reasonableness of the subcontract's terms, the appellate court remanded the case for findings of fact and conclusions of law on that issue. The court stated, however, that if the trial court should determine that Lichtenberg's proposed contract terms were customary in the industry, then Wilson was required to honor its bid.

{¶ 34} Based on *Lichtenberg,* Complete General argues that the trial court erred by concluding that its claims failed because Complete General did not seek to have Kard perform in accordance with the terms of the original quote, because Complete General did not notify Kard within a reasonable time that it was accepting Kard's offer, and because Kard should not have reasonably expected certain of Complete General's terms and conditions.

{¶ 35} The magistrate concluded that "Complete General did not notify Kard within a reasonable time after December 6, 2002 that it was accepting Kard's offer." Complete General correctly argues that December 6, 2002—the date the bids were opened—was an improper starting point for determining whether it notified Kard within a reasonable time that it was accepting Kard's offer. However, given Complete General's failure to accept Kard's original quote at all, the trial court's reference to an improper date does not discount its conclusion that Complete General did not notify Kard within a reasonable time that it was accepting Kard's offer, as required to recover under *Drennan* and *Wargo.*

{¶ 36} The magistrate next concluded that Kard was not liable to honor its original quote because Complete General did not seek to have Kard perform in accordance with the terms of the original quote. Based on *Lichtenberg,* Complete General argues that Kard was bound to honor its original quote as long as Complete General's proposed terms were reasonable. We do not find *Lichtenberg,* which has not been cited in the nine years since its issuance, determinative. First, *Lichtenberg* is factually distinguishable. Not only did Lichtenberg orally notify Wilson that it accepted its quote and intended to enter into a subcontract, Lichtenberg actually delivered a subcontract to Wilson. Thus, at least facially, Lichtenberg accepted Wilson's offer. Furthermore, there is no indication in *Lichtenberg* that Wilson's subcontract quote was conditioned upon acceptance of specified terms and conditions. To the contrary, here, Kard's original quote stated that it was "expressly made conditional on * * * assent to the terms and conditions" contained therein and in Kard's standard terms and conditions of sale attached to the quote. Complete General's rejection of Kard's specified terms and proposal of materially different terms cannot be construed as an acceptance of Kard's offer, especially in the absence of a subcontract or purchase order

executed by Complete General. Rather, Complete General's actions are more akin to the proposal of a counteroffer. See *Foster v. Ohio State Univ.* (1987), 41 Ohio App.3d 86, 88, 534 N.E.2d 1220, citing Restatement (Second) of Contracts (1981), Formation of Contracts–Mutual Assent, Section 59 ("A reply to an offer which purports to accept but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counteroffer").

{¶ 37} Even were we to accept Complete General's premise that the doctrine of promissory estoppel applies in this context, not only to provide a general contractor a reasonable opportunity to accept a subcontractor's quote, but also to obligate performance by the subcontractor, Complete General's actions weigh against application of promissory estoppel in this case. Recognizing that contractors could easily abuse the doctrine of promissory estoppel, *Drennan* determined that the doctrine would be inapplicable in the following circumstances: (1) the general contractor's reliance on the subcontractor's quote was unreasonable, (2) the subcontractor's quote was expressly revocable, (3) the general contractor unreasonably delayed acceptance, or (4) the general contractor engaged in bid-shopping. As promissory estoppel is an equitable doctrine, courts have imposed certain limitations to prohibit its application when the general contractor's conduct renders it unfair to hold the subcontractor to its bid. Among the grounds upon which courts have denied recovery are the following: (1) the general contractor did not rely on the bid, (2) the general contractor failed to accept the bid within a reasonable time, and (3) the general contractor made a counteroffer, in effect rejecting the subcontractor's offer. See, e.g., *Drennan*, 51 Cal.2d at 415, 333 P.2d 757 ("[A] general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer"); *Hedden v. Lupinsky* (1962), 405 Pa. 609, 176 A.2d 406; *Haselden–Langley Constructors, Inc. v. D.E. Farr & Assoc., Inc.* (Colo.App.1983), 676 P.2d 709. See also 1 Corbin, Corbin on Contracts (Rev.Ed.1993) 292, Section 2.31 ("it is generally agreed that the general contractor cannot, after being awarded the contract, reopen the bidding with the subcontractors to chisel down the bids, while at the same time maintaining that the low-bidding subcontractor remains liable").

{¶ 38} Here, despite its claimed reliance on Kard's original quote, after obtaining the general contract from ODOT, Complete General admittedly re-sumed negotiations with other subcontractors regarding the structural steel subcontract and did not accept Kard's original quote. For these reasons, we conclude that the trial court did not err in determining that Kard was not bound

to honor its original quote. Accordingly, we overrule Complete General's second assignment of error.

{¶ 39} Having overruled both of Complete General's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

Judgment affirmed.

BRYANT and KLATT, JJ., concur.